NelsoN, J.,
delivered the opinion of the Court.
The plaintiff in error was indicted and convicted in the Circuit. Court of Hardin county, for unlawfully selling spirituous liquors on the Sabbath day. It was adjudged that he should pay a fine of twenty-five dollars and the costs of the prosecution; and from this judgment he prosecutes this appeal in error to this Court. The proof shows, clearly, that, on a Sunday in April, 1868, the plaintiff in error sold and received payment for “three drinks of whisky, at Pittsburg Landing; that the sale was made some forty or fifty yards outside of the cemetery inclosure at that place, and outside the corner post designating the line of the Government fence, but within the lines occupied by the officers, soldiers and employes; that he was closer to the cemetery inclosure than the soldiers’ tents, and between them and the inclosure; that the houses occupied by the employes were “scattered around his establishment; that there were United States soldiers, officers and employes there at the time, at work on the_cemetery grounds, and the house occupied by him was put up after they were stationed there. The plaintiff in error proved that a paper, purporting to be an extract from Special Order, No. 34, which was signed “By command of Maj. Gen’l Geo. H. Thomas, A. W. Wills, Brevet Lt. Col., and A. Q,. M., in charge of Cemeteries at Corinth and Pittsburg Landing,” was in the handwriting of said Wills. This order states that “H. Harbert & Co., (composed of H. Harbert and C. W. Wills,) are hereby appointed sutlers for the employes in government service engaged in the construction of the *143 National Cemetery at Pittsburg Landing, Tennessee, and are authorized to sell merchandize, or other articles the said employes may from time to time, need/’
The reading of this order was objected to on the part of the State, but the objection was overruled. Among other things, the Circuit Court instructed the jury, “if the proof showed that the selling of the liquor was within the boundary of the ten acres ceded by the State of Tennessee to the United States for a National Cemetery, that the courts would have no jurisdiction of the cause; but on the contrary, if from the evidence, the jury believed that the sale was outside of the ten acres so ceded, that the court would have jurisdiction; that the distance was immaterial, nor did it matter if the officers, soldiers and employes of the Government had their quarters around and beyond the house where the liquor was sold, and were occupying the same.” The Court further charged that “a preponderance of proof was sufficient to warrant a verdict of guilty; and that, in prosecutions of this character, the law did not require such quantum of proof as would exclude reasonable doubt.”
The solution of the main question depends upon the construction to be given to the Act of 9th of March, 1867, c. 44, entitled, “An Act to cede to the United States the jurisdiction over the National Cemeteries in this State, and to protect the same.” The Act is framed in a very loose and inartificial manner, but its meaning can probably be ascertained with reasonable certainty. The first section provides that “the exclusive jurisdiction over the several tracts of land and parcels of ground, with the appurtenances thereto, obtained, purchased, used or occu *144 pied for burial purposes, by or for the United States, hereinafter described by their names and location, with the premises thereto attached, for officers’ and soldiers’ quarters, and for guards, is hereby ceded to the United States; Provided, however, that jurisdiction thereof shall be retained by the State of Tennessee, so far as to punish offenders against this law, by presentment or indictment, and fine and imprisonment, as hereinafter provided.”
In the description of cemeteries, no mention is made of Pittsburg Landing, eo nomine, but that place is described as “Shiloh National Cemetery, containing about ten acres,” and we know, historically, that the two places are treated as the same. Section 2 provides, “that the exclusive jurisdiction over all tracts and parcels of land, with the buildings and appurtenances belonging to the same, including the quarters for officers, keepers, guards, or soldiers, in charge of ■ the same, and the premises connected therewith, now, or at any time hereafter, purchased, used, or occupied by the United States, their officers, or agents, for cemeteries or burial places, within the limits of the State, is hereby ceded to the United States; and whenever such premises shall be no longer required, used or occupied by the United States, the jurisdiction of such abandoned property’may revert to the State of Tennessee.
The third section exonerates the property from State and municipal taxation, until the jurisdiction shall have reverted; and provides that, “'the title and possession to the said cemeteries, grounds, buildings and appurtenances shall be protected to the United States, and no process of any courts shall be permitted against the *145 same, or to dispossess tbe officers, or agents of the United States thereof, without restricting any just claim for damages or value in the form or mode provided by the United States for prosecuting the same.” The fourth section provides for the punishment of any offender guilty of a voluntary injury to, or mutilation of, the graves, monuments, &c. See Pamphlet Acts, 1866 7, pp. 64, 65.
In construing this legislative grant, we are of opinion that the words, in the first section, “with the premises thereto attached, for officers’ and soldiers’ quarters;” and the words in the third section, “with the buildings and appurtenances belonging to the same, including the quarters for officers, keepers, guards or soldiers, in charge of the same, and the premises connected therewith,” are fugitive and temporary in their nature; and in view of the nature of the thing granted, and the purposes for which the grant was made, are to be regarded as ceding to the United States, not only the jurisdiction over the ten acres of land, but jurisdiction over such of the land immediately adjoining, as was used or occupied for officers’ and soldiers’ quarters, and for guards or soldiers in charge of the cemetery and the buildings immediately adjacent thereto. That the grant relates only to the temporary occupation of the adjacent lands, while the cemetery and the buildings, if any, thereon and tire fencing around the land, are in process of construction or repair, is manifest from the provision in the third section, that whenever such premises, (referring to the premises adjacent,) are no longer required, used or occupied by the United States, the jurisdiction of such abandoned property may revert to the State of Tennessee. There was an *146 obvious propriety in' conferring this limited and exclusive jurisdiction, as the officers, keepers, guards or soldiers, would, most probably, be under the control of the United States, and any offense committed within the lines of their occupation, would be governed by the laws of Congress, or the army regulations. But the words “exclusive jurisdiction,” must, upon any known or reasonable construction, be limited to the object and purposes of the grant; and it is not to be presumed that the State of Tennessee would yield, or that the United States would accept, the exclusive jurisdiction of all the crimes or misdemeanors committed within the limits of the cemetery, or the premises adjacent, when there is no actual occupation, on the part of the United States, by officers, keepers, guards or soldiers, for purposes connected with the cemetery. Although the State agrees, in section four, that the title of the United States shall be protected, it was not the intention so to divest the State of her .soverignty as to give absolute impunity to all offenses against the State within the cemeteries and grounds adjacent, when not in the actual occupation of the United States.,,
To give this construction to the grant, would be to hold, that the eemetery is a “City of Refuge” for all offenders against the laws of the State. It was not the intention of the grant, that the land should be used for any other purpose than that of a cemetery for the repose ■of the dead; and the exclusive jurisdiction conferred, relates, alone, to the measures necessary to be adopted by the United States, from time to time, in order to effectuate this cardinal purpose.’ It was held, in United States v. Coryell, 2 Mason, 60, that, “the purchase of lands by *147 the United States, for public purposes, within, the territorial limits of a State, does not, of itself, oust the jurisdiction, or sovereignty, of such State over the lands so purchased.”
The Constitution prescribes the only mode by which they can hold land as a sovereign power, and therefore, they hold only as an individual when they obtain it in any other manner. In cases cited in Paschal’s Annotated Constitution, 137, whether the power conferred upon Congress in the National Constitution, Arlicle 1, Section 8, to purchase a district for the seat of Government and “to exercise like authority over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock yards and other needful buildings,” was intended to include such a purchase as that under consideration, it is needless to discuss; and it may be assumed, that the acquisition, for the purposes intended, is within the spirit of that instrument. Mr. Justice Story says, that “a great variety of cessions have been made under this power, and generally, there has been a reservation of the rights to serve all State process, civil and criminal, upon persons found therein:” Story on Const., § 1225. See, also, Act of 1795, ss. 1, 2; 1828, sec. 2; Brightley’s Dig., 489, sections 181, 182, 184.
From the peculiar nature of the legislative grant under consideration, and the special and only purpose for which it was made, it may be fairly implied, that the exclusive jurisdiction granted, is limited to the purposes and circumstances we have indicated. We, there *148 fore, bo]cl, that, as the proof shows that when the misdemeanor alleged in this case is supposed to have been committed, the United States had actual possession of the premises, by reason of the guard of soldiers, His Honor erred in his instructions to the jury, and should have charged that the Circuit Court had no jurisdiction of the offense.
His Honor also erred in his charge, as to the preponderance of proof and reasonable doubts. The benevolent and long cherished maxims of the law on these subjects, are applicable to criminal prosecutions of every grade, as we held in a case at the last Term in Knoxville.
Let the judgment be reversed and arrested, and the defendant discharged.