THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DOMINICK DANTONIO, DEFENDANT-APPELLANT.

Argued May 23, 1955—Decided June 20, 1955.

Mr. *Walter S. Anderson* argued the cause for the appellant.

Mr. *Harold Kolovsky*, Assistant Attorney-General, argued the cause for the respondent (Mr. *Grover C. Richman, Jr.*, Attorney-General and Mr. *James T. Kirk*, Deputy Attorney-General, attorneys).

The opinion of the court was delivered by

JACOBS, J.   State Troopers operating radar speedmeter equipment along the New Jersey Turnpike charged the defendant with having violated its 60-mile speed limit.   The defendant was found guilty in the Municipal Court of Milltown and, after trial *de novo* in the Middlesex County Court, he was again found guilty.   See *State v. Dantonio*, 31 *N. J.*

*Super.* 105 (*Cty. Ct.* 1954). He appealed to the Appellate Division and we certified under *R. R.* 1:10–1.

On February 2, 1954 Troopers Armstrong, Trainor and Trpisovsky, as members of a radar team, set up their equipment along the New Jersey Turnpike. The radar equipment, which included transmitting and receiving devices as well as a calibrated speedmeter needle and a permanent graph indicating the speed of cars passing within range of the waves being transmitted, was placed on a station wagon alongside the road. Trooper Trpisovsky testified that he hooked up the power supply, tested the machinery after a warm-up period to see that it was operating properly, and observed that both the meter and the graph were at zero when no cars were within range. Troopers Armstrong and Trainor testified that after the machinery was tested they drove their cars within range and, by radio communication, notified Trooper Trpisovsky of their respective speeds; when Trooper Armstrong's car was traveling at 75 miles per hour as evidenced by his own speedometer the radar device recorded 75 miles per hour; when Trooper Trainor's car was traveling at 89 miles per hour as evidenced by his own speedometer the radar device recorded 86 miles per hour. Dr. Kopper, a qualified electrical engineer associated with Johns Hopkins University, testified that in his opinion the Troopers' radar equipment "was properly and carefully used and that it would give an accurate indication of speed." He testified further that there would be tolerances for errors of "two miles plus or minus" and that any inaccuracies resulting from the placing of the equipment at the side rather than in the center of the road or from the weakening of the machinery or its power would produce lower rather than higher speed readings. See *Kopper, The Scientific Reliability of Radar Speedmeters*, 33 *N. C. L. Rev.* 343, 352 (1955). He expressed the view that it was not necessary that the operator of the radar equipment "be an electrical engineer or have other special technical skills"; Trooper Armstrong had been operating it since February 1953 and Trooper Trpisovsky had been operating it since August 1953. *Cf. Kopper, supra,* at 353, where the

author states that "the average person engaged in traffic control work can learn to use the radar speedmeter after about one and one-half to two hours of instruction."

The defendant Dantonio was employed by Quaker City Bus Co. as a bus driver. He testified that about 6 P. M. on February 2, 1954 he left the toll booth at interchange No. 4 and drove onto the Turnpike. Trooper Trpisovsky testified that between 6:45 and 6:50 P. M. the defendant's bus came within range of his radar equipment and that the meter needle and the permanent graph both recorded that the bus was then traveling at the rate of 69 or light 70 miles per hour; he noted the bus license number and radioed it to Trooper Armstrong who was stationed some 500 to 600 feet ahead. Trooper Armstrong testified that he intercepted the defendant, told him that his speed had been recorded by radar, and issued a summons and complaint which charged him with traveling at 66 miles per hour in a 60-mile speed zone. Mr. Ricker, a traffic engineer employed by the New Jersey Turnpike, testified that the distance between interchange No. 4 and mile post 80½, near the point where the radar equipment was set up, was 46¼ miles. The defendant's bus made no stops from the time it left the toll booth at interchange No. 4 to the time it was intercepted by Trooper Armstrong; the defendant testified that he was stopped by Trooper Armstrong at "around 6:48 or 6:50" P. M.

The defendant's bus was equipped with a Tachograph which is manufactured by the Sangamo Electric Company. Mr. William S. Paine, an employee of Sangamo, described the Tachograph as "essentially a combination of a clock speedometer, odometer and recording machine, intended to produce a record on a chart of vehicle speed in miles per hour, miles traveled, and a record of whether or not the engine of the vehicle is idling while the vehicle is stopped." He testified that the chart indicated that the highest speed attained by the defendant's bus was approximately 61½ miles per hour at 6:12 P. M.; that it had stopped at about 5:58 P. M. and thereafter at 6:41 P. M.; and that in the interim it had covered 42 miles in 43 minutes. If the

Tachograph, as interpreted by Mr. Paine, was correct, then the defendant had traveled 42 miles in 43 minutes including, significantly, the time during acceleration and brakeage; if, however, the stated mileage was incorrect, as appears from Mr. Ricker's testimony, then the defendant had illegally traveled over 46 miles in 43 minutes; and if, as counsel for the defendant now seems to suggest, Mr. Paine actually misinterpreted the chart and "erred in both the distance and the time readings by an even 5 miles" then his testimony was entitled to little weight indeed.

The County Court expressly determined (1) that the radar equipment "was properly set up and tested for accuracy and was functioning properly and was a correct recorder of speed"; (2) that the defendant "was exceeding the speed limit of the New Jersey Turnpike and was traveling at 66 miles per hour, as charged"; and (3) that the State had "established the guilt of the defendant beyond a reasonable doubt." Our function on appeal ordinarily is not to make new factual findings but simply to decide whether there was adequate evidence before the County Court to justify its finding of guilt. See *State v. Glynn*, 20 *N. J. Super.* 20, 27 (*App. Div.* 1952); *State v. Matchok*, 14 *N. J. Super.* 359, 360 (*App. Div.* 1951); *State v. Nolan*, 1 *N. J. Super.* 280, 282 (*App. Div.* 1949). *Cf. Midler v. Heinowitz*, 10 *N. J.* 123 (1952); *Hager v. Weber*, 7 *N. J.* 201 (1951).

Although there have been no appellate decisions in our own State there have been several decisions in courts of other states and numerous articles in legal publications which have dealt comprehensively with the evidential problems presented by the use of radar speedmeters. See *State v. Moffitt, Del. Super.*, 100 *A. 2d* 778 (*Del. Super. Ct.* 1953); *People v. Offermann*, 204 *Misc.* 769, 125 *N. Y. S. 2d* 179 (*Sup. Ct.* 1953); *People of City of Rochester v. Torpey*, 204 *Misc.* 1023, 128 *N. Y. S. 2d* 864 (*Cty. Ct.* 1953); *People v. Katz*, 205 *Misc.* 522, 129 *N. Y. S. 2d* 8 (*Sp. Sess.* 1954); *People v. Sarver*, 205 *Misc.* 523, 129 *N. Y. S. 2d* 9 (*Sp. Sess.* 1954); *People of City of Buffalo v. Beck*, 205 *Misc.* 757, 130 *N. Y. S. 2d* 354 (*Sup. Ct.* 1954); *Baer, Radar Goes to Court*, 33

N. C. L. Rev. 355 (1955); *Woodbridge, Radar in the Courts,* 40 *Va. L. Rev.* 809 (1955); *Notes,* 30 *N. C. L. Rev.* 385 (1952); 38 *Marq. L. Rev.* 129 (1954); 28 *Tul. L. Rev.* 398 (1954); 58 *Dick. L. Rev.* 400 (1954); 15 *Ohio St. L. J.* 223 (1954); 39 *Iowa L. Rev.* 511 (1954); 5 *Mercer L. Rev.* 322 (1954); 7 *Vand. L. Rev.* 411 (1954); 30 *Wash. L. Rev.* 49 (1955); 23 *Tenn. L. Rev.* 784 (1955). See also *McCormick, Evidence,* § 170 (1954); 2 *Wigmore, Evidence* (*3rd ed.* 1940), § 417(*b*).

Through the years our courts have properly been called upon to recognize scientific discoveries and pass upon their effects in judicial proceedings. When fingerprint evidence was not accepted as universally as it is now, the Court of Errors and Appeals was required to deal with the contention that the trial court had erred in permitting an expert to testify as to the art of fingerprinting and its use as a means of identification; in holding that the testimony had properly been admitted Justice Minturn in *State v. Cerciello,* 86 *N. J. L.* 309, 314 (*E. & A.* 1914), aptly said:

"In principle its admission as legal evidence is based upon the theory that the evolution in practical affairs of life, whereby the progressive and scientific tendencies of the age are manifest in every other department of human endeavor, cannot be ignored in legal procedure, but that the law, in its efforts to enforce justice by demonstrating a fact in issue, will allow evidence of those scientific processes which are the work of educated and skillful men in their various departments, and apply them to the demonstration of a fact, leaving the weight and effect to be given to the effort and its results entirely to the consideration of the jury. *Stephen Dig. Ev.* 267; 2 *Best on Ev.* 514."

See also *State v. Connors,* 87 *N. J. L.* 419, 420 (*Sup. Ct.* 1915); *Lamble v. State,* 96 *N. J. L.* 231, 236 (*E. & A.* 1921). *Cf. Wigmore, supra,* § 414. Today no one questions the general accuracy and effectiveness of the art, and expert proof has long been replaced by judicial notice. *Lamble v. State, supra; Cortese v. Cortese,* 10 *N. J. Super.* 152, 157 (*App. Div.* 1950); *Note, Fingerprints, Palm Prints, or Bare Footprints as Evidence,* 28 *A. L. R.* 2d 1115, 1119 (1953). Similarly, courts no longer require expert proof that X-ray

machines, cardiographs and similar scientific devices used by the medical profession are trustworthy. See *Wigmore, supra,* §§ 665a, 795; *Baer, supra,* 361. *Cf. Call v. City of Burley,* 57 *Idaho* 58, 73, 62 *P. 2d* 101, 107 (*Sup. Ct.* 1936), where the court noted that "The science of X-ray skiagraphy is too well founded and generally recognized to render it any longer necessary for a witness to testify as to the reliability and trustworthiness of X-ray skiagrams as such, before admitting them in evidence."

In *Cortese v. Cortese,* 10 *N. J. Super.* 152, 156 (*App. Div.* 1950), the court expressed the view that judicial notice may now be taken of the fact that a proper blood grouping test may exclude paternity; in the course of his opinion Judge (now Justice) Brennan, said:

"The value of blood tests as a wholesome aid in the quest for truth in the administration of justice in these matters cannot be gainsaid in this day. Their reliability as an indicator of the truth has been fully established. The substantial weight of medical and legal authority attests their accuracy, not to prove paternity, and not always to disprove it, but 'they can disprove it conclusively in a great many cases provided they are administered by specially qualified experts,' *Beach v. Beach,* 72 *App. D. C.* 318, 114 *F. 2d* 479, 480 [131 *A. L. R.* 804] (*D. C. Cir.* 1940), and see *Annotation,* 163 *A. L. R.* 923; *Jordan v. Mace,* [144 *Me.* 351] 69 *A. 2d* 670 (*Sup. Jud. Ct.* 1949); *Report, Committee on Medicolegal Blood-grouping Tests,* 108 *Am. Med. Ass'n. Journal,* 2138–2142 (June, 1937). A wealth of medical, scientific and legal references will be found in *Schatkin, 'Disputed Paternity Proceedings'* (2d *Ed.* 1947), *p.* 184; *Wigmore on Evidence, vol. I, sec.* 165a *et seq.* (3d *Ed.* 1940). Blood tests can now disprove paternity in over one-half of the paternity cases involving innocent men. 63 *Harvard Law Review* 1271 (*May* 1950).

It is plain we should hold, as we do, that this unanimity of respected authorities justifies our taking judicial notice of the general recognition of the accuracy and value of the tests when properly performed by persons skilled in giving them. The law does not hesitate to adopt scientific aids to the discovery of truth which have achieved such recognition."

*Cf. Anthony v. Anthony,* 9 *N. J. Super.* 411, 414 (*Ch. Div.* 1950); *Miller v. Domanski,* 26 *N. J. Super.* 316, 321 (*App. Div.* 1953). In *Ross v. Marx,* 21 *N. J. Super.* 95 (*Cty. Ct.* 1952), affirmed 24 *N. J. Super.* 25 (*App. Div.* 1952), certifica-

tion denied 14 *N. J.* 466 (1954), the County Court took the position that blood grouping tests disproving paternity had been universally accepted in medical and scientific fields and that judges should accept them as conclusive; however, the Appellate Division, while recognizing fully that the results of the blood grouping tests were admissible in evidence, held that they were not conclusive but were to be weighed by the trier of facts in conjunction with all other evidence in the case. It may be noted that in support of its conclusion the Appellate Division apparently took judicial notice of medical writings which suggested the possibility of error in the tests. See 24 *N. J. Super.*, at *page* 27; *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey,* 165, 167 (1955).

▮ Since World War II members of the public have become generally aware of the widespread use of radar methods in detecting the presence of objects and their distance and speed; and while they may not fully understand their intricacies they do not question their general accuracy and effectiveness. Dr. Kopper has pointed out that, in contrast to other radar methods, the method actually used in the speedmeter is rather simple and has been adopted by many law enforcement bodies; a recent tabulation indicates that speedmeters are being used in 43 states by almost 500 police departments. See *Radar Traffic Controls,* 23 *Tenn. L. Rev.* 784 (1955). The writings on the subject assert that when properly operated they accurately record speed (within reasonable tolerances of perhaps two or three miles per hour) and nothing to the contrary has been brought to our attention; under the circumstances it would seem that evidence of radar speedmeter readings should be received in evidence upon a showing that the speedmeter was properly set up and tested by the police officers without any need for independent expert testimony by electrical engineers as to its general nature and trustworthiness. See *Professor Woodbridge, supra,* at 814:

"Under the *Uniform Rules of Evidence,* already approved by the American Bar Association at its 1953 meeting, judicial notice 'shall be taken without request by a party * * * of such specific

facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute.' Radar speed meters are now in this category. Why should the time of experts be wasted and the expenses of litigation be increased by compelling such men to appear in court after court telling the same truths over and over? While it is agreed that every reasonable doubt about the accuracy of new developments should promptly be resolved against them in the absence of expert evidence, there is no longer any such doubt concerning radar. Rather, the applicable maxim should now be, 'What the world generally knows a court of justice may be assumed to know.' "

See also *Baer, supra*, at 381 where Professor Baer, a member of the New Jersey bar and the faculty of the University of North Carolina School of Law, expressed the view that there was now "more than adequate knowledge of the operation and accuracy of radar speedmeters in the area of science to which these devices belong to warrant their being accorded judicial recognition without the aid of expert testimony or legislative direction." *Cf. R. S.* 39:4–50.1; *State v. Hunter*, 4 *N. J. Super.* 531 (*App. Div.* 1949), *Id.*, 12 *N. J. Super.* 128 (*App. Div.* 1951).

█ In the instant matter the State Troopers were sufficiently qualified to set up their radar speedmeter and the evidence indicated that they duly tested it before its use. They had then been operating it for many months and could readily observe whether it was in regular working order. They had no difficulty in reading the calibrated needle and the permanent graph and it was no more necessary that they actually understand the intricate electrical workings of the device than that they understand how their car speedometers work. They tested the speedmeter to see that it registered "zero" when nothing was in range and they pushed a designated switch to "test" position to observe that the needle reacted properly; then they compared radar readings with speedometer readings on their cars which were driven within range. In one instance these readings were identical and in the other they favored the car; it may be noted, as Dr. Kopper testified below, that all types of error actually suggested during the trial would result in lower radar readings

thus favoring the car. Before this court the defendant has also suggested the possibility of error but has pointed to no evidence of error which would not favor him. In any event, the possibility of error would not wholly deny the admissibility of the radar evidence but would simply affect its weight; the State concedes that the readings were not conclusive but merely constituted admissible evidence to be weighed by the trier of facts along with all other evidence which was logically relevant. See *Miller v. Trans. Oil Co.*, 18 *N. J.* 407, 413 (1955); *In re Vince*, 2 *N. J.* 443, 457 (1949); *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey*, 3, 10 (1955).

The defendant points out that there was no affirmative evidence introduced by the State to establish that the speedometers in the Troopers' cars had been recently tested. It would, perhaps, have been the better course for the State to have introduced such testimony and presumably it would have done so if the defendant had raised the point in due time before the close of the trial. However, he did not in anywise question the Troopers on the subject and made no mention of it until the testimony had been fully completed and summations were taking place. Under these circumstances the defendant is hardly in any just position to attack the accuracy of the speedometers. See *Penny v. Nicholas* [1950], 2 *K. B.* 466, *All Eng.* 89 (1950), where the court held that a speeding conviction may be sustained on the basis of a reading of the speedometer in the police officer's car without affirmative evidence that the speedometer had recently been tested. *Cf. Note, Presumption and Burden of Proof of Accuracy of Scientific and Mechanical Instruments for Measuring Speed, Temperature, Time and the Like*, 21 *A. L. R.* 2d 1200 (1952).

In the *Penny* case, *supra*, Lord Goddard, C. J., cited earlier English cases in which an officer had been permitted to testify that he had timed the defendant with a stop watch though no evidence was introduced that the watch had been tested; indeed, our courts receive evidence daily of readings on

watches, scales and other measures without affirmative proof of their testing; the defendant is, of course, at liberty to attack the readings through cross-examination and otherwise and the ultimate determination is fairly left to the trier of facts. See *Penny v. Nicholas, supra*:

> "* * * it is admissible evidence if an officer says: 'I followed this man and observed from my speedometer that I was progressing at the rate of forty miles an hour. Therefore, he must have been progressing at that rate because I kept an even pace behind him.' No one is saying that that is more than *prima facie* evidence. There may be cross-examination; there may be evidence given on the other side. The defendant may say: 'That is all very well, but my own speedometer showed that I was only going at twenty-five or thirty miles an hour.' Then the justices have to make up their minds between the parties, and it may be that, after seeing the witnesses and hearing their evidence, they may prefer the evidence given by the defendant to the evidence given by the police.
>
> The question is whether or not, if a police officer says: 'I was following this man and the speedometer on my car showed that he was going, not at thirty and a half, or just over thirty miles an hour, but at forty miles an hour,' that is not evidence on which the justices can act, although it is not strictly proved before them that the speedometer has been tested. Therefore, we propose to send the case back to the justices and to ask them whether, apart from the test that was afterwards carried out, they would have held on the evidence of P. C. England and his observation of the driving and his speedometer on October 2, the day of the offence, they were satisfied that the appellant was travelling over thirty miles an hour. They can say, if it is desired, that the evidence of the test was strictly not admissible, but the justices must make up their minds whether they were satisfied, apart from the test, that the car was being driven at a speed exceeding thirty miles an hour."

It was not essential that the County Court determine the precise speed at which the defendant's bus was traveling when intercepted by Trooper Armstrong; the defendant was guilty if the evidence established that he was exceeding the 60-mile speed limit. In view of the court's explicit determination (supported as it was by the evidence) that the radar equipment "was properly set up and tested for accuracy and was functioning properly and was a correct recorder of speed," its readings constituted legal evidence to support the finding of guilt. The court properly found no occasion to pass on

the general worth of the Tachograph since the interpretation of the Tachograph's markings by the defendant's own witness, Mr. Paine, seemed, particularly in the light of Mr. Ricker's testimony, to support rather than negative the defendant's guilt. It is true that a subsequent test, held on February 4, 1954 with the approval of the parties, indicated that both the radar equipment and the Tachograph were then recording identical and accurate readings. However, that fact in nowise affected the trial court's judgment that upon the record before it relating to the occurrence on February 2, 1954, the defendant's guilt had been established beyond reasonable doubt; there having been sufficient evidence before the court to sustain its action we shall not disturb it. See *State v. Glynn, supra; State v. Malchok, supra; State v. Nolan, supra.*

Only two of the reported out-of-state cases involving convictions resting on radar speedmeter readings were reversed on appeal; they were *People v. Offermann, supra* and *People of City of Buffalo v. Beck, supra,* both decided by Justice Ward sitting in the New York Supreme Court, Erie County. In the *Offermann* case the sole evidence presented was the reading of the meter needle and there was no expert testimony or any permanent graph recording as in the instant matter. In the *Beck* case there likewise was no expert testimony and the court held that the trial judge had improperly taken judicial notice of the general effectiveness of radar speedmeters; in the course of its opinion it stated that "the theory of the operation of this electrically operated device and the accuracy of its measurement of speed is not a proper subject for judicial notice at this time." [205 *Misc.* 757, 130 *N. Y. S. 2d* 357.] We have, earlier in this opinion, sufficiently indicated our views on this particular issue. While it is vital under our basic concepts of justice and due process that every individual accused of a speeding violation be afforded a fair hearing and be not adjudged guilty without evidence which convinces beyond reasonable doubt, it is equally vital that no unnecessary obstacles be placed in the State's efforts to deal fairly and effectively with a public

threat which has reached staggering proportions. The number of highway accidents is appalling and speed is generally recognized as a factor particularly where fatalities and serious injuries are involved; the latest report by the Turnpike Authority shockingly discloses that during the past month of May there were no less than 52 Turnpike traffic accidents resulting in injury to 86 persons and death to six others. Speed limits of 50 and 60 miles per hour have become commonplace and they are sufficiently high to suggest that those who exceed them should be considered as unduly endangering the public welfare and as meriting moral condemnation and the full effects of the law. In dealing with this as well as other law enforcement problems, enlightened officials properly avail themselves of scientific discoveries as soon as their reliability appears and modern courts of justice may not rightly lag far behind. We are satisfied that readings on radar speedmeters which have been set up and operated in the manner established by the evidence in the instant matter constitute legally admissible evidence which may readily support a finding of guilt by the trier of the facts.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.