**UNITED STATES of America**
v.
**George C. DREOS.**
Crim. No. 23812.

United States District Court
D. Maryland.
Criminal Division
Oct. 11, 1957.

Leon H. A. Pierson, U. S. Atty., and William J. Evans, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

George C. Dreos, pro se.

THOMSEN, Chief Judge.

The information in this case charges that: "On or about the 15th day of August, 1956, in Prince George's County, in the State and District of Maryland, George C. Dreos did, on lands reserved or defined for use of the United States and under the concurrent jurisdiction of the United States and the State of Maryland, to wit, the Baltimore-Washington Parkway, operate a motor vehicle * * * at a rate of speed exceeding fifty-five (55) miles per hour. U.S.C. Title 18, Sections 7(3) and 13, Annotated Code of Maryland, (1951), Art. 66½, Sec. 176." [1]

---

1. Title 18 U.S.C. § 7: *"Special maritime and territorial jurisdiction of the United States defined.* The term 'special maritime and territorial jurisdiction of the United States', as used in this title, includes: * * * (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

Title 18 U.S.C. § 13: *"Laws of states adopted for areas within federal jurisdiction.* Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or

Defendant, a lawyer, raises three issues: (1) jurisdiction, (2) use of radar equipment in determining the speed of the car, and (3) proof of criminal intent.

(1) Defendant states the first issue as follows:

"Whether this Court has jurisdiction of this case in view of the provision of the U. S. Constitution, to wit: Article I, Section 8, Clause 17, which provides that 'the Federal Government shall exercise exclusive legislation * * * over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings' and Article 4 of the Bill of Rights of the Constitution of Maryland which provides, 'That the people of this State have the sole and exclusive right of regulating the internal government and police thereof, as a free sovereign and independent State' ?"

He concedes that the Government properly acquired legal title to the land upon which the Washington half of the Baltimore-Washington Parkway was built, over which he is charged with speeding, and concedes that the term "building" in Art. I, sec. 8, clause 17 includes "whatever structures are found to be necessary in the performance of the functions of the federal government". James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 213, 82 L.Ed. 155. He contends, however, that highway roadbeds are not structures and that the Federal Government did not acquire either exclusive or concurrent jurisdiction over the land condemned for the construction of the parkway.

Defendant's statement of the issue is too narrow. For the reasons set out below, concurrent legislative jurisdiction in the United States sufficient to justify the enactment and enforcement of the law under which defendant is prosecuted in this case may be sustained either under Art. I, sec. 8, clause 17, quoted above, or under Art. IV, sec. 3, clause 2 of the Constitution of the United States, which reads as follows:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."

The problem of jurisdiction over federal areas within the states is difficult and complicated. It is the subject of a recent two volume report entitled "Jurisdiction over Federal Areas within the States", prepared by an Interdepartmental Committee and published by the Government Printing Office, vol. 1 in 1956 and vol. 2 in 1957. This report considers at great length the legislative, administrative and judicial history of the problem over the years, and analyzes the present situation in the several states with respect to land acquired and held by the Federal Government for various purposes. I will not repeat that historical discussion, but will refer only to the Federal and State statutes which affect this case.

omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment."

Maryland Code, Art. 66½, sec. 176, as in force in August, 1956: "(Speed Restrictions.) * * * (d) No motor vehicle shall be operated upon any high-

way of this State at a rate of speed greater than fifty miles per hour, or fifty-five miles per hour on dual lane through highways, under any circumstances or conditions. * * * (f) [Penalties.] * * * Violation of Paragraph (d) shall be deemed to be a misdemeanor and any person upon conviction shall be fined not less than Ten ($10.00) Dollars nor more than One Hundred ($100.00) Dollars."

The Baltimore-Washington Parkway is divided into two roughly equal parts. The Baltimore half was built by the State of Maryland on land owned by the State; the Washington half was built by the Federal Government on land owned by the United States.

The Washington half, comprising a small portion within the District of Columbia and a much larger portion within the territorial boundaries of the State of Maryland, is regarded as an extension of the park system of the District of Columbia and its environs; it was constructed and developed and is administered and maintained by the Secretary of the Interior, through the National Park Service, subject to the provisions of the Act of Congress of Aug. 25, 1916, 39 Stat. 535, 5 U.S.C.A. § 485, the provisions of which were extended over and made applicable to the parkway by the Act of Aug. 3, 1950, 64 Stat. 400. See also 16 U.S.C.A. §§ 1c, 2, 3, and 40 U.S.C.A. §§ 70 to 74, together with notes and annotations thereto.

The parkway passes through areas acquired by the Federal Government at different times and for different purposes, so the several areas do not have the same legislative jurisdictional status. Portions of the land on which the parkway was built were acquired originally by the War Department (where the road passes through Fort George G. Meade), by the Department of Agriculture (near Beltsville), and by the Resettlement Division (near Greenbelt). The portion on which the offense charged in this case occurred was acquired in 1944 through condemnation proceedings in the United States District Court for the District of Maryland, Civil No. 2272.[2]

Before 1943 the Maryland Code contained the three sections quoted below, which were enacted by chap. 743 of the Acts of 1906. They are now codified as secs. 31, 35 and 36 of Art. 96 of the Annotated Code of Maryland, 1951 ed.

"31. The consent of the State of Maryland is hereby given in accordance with the seventeenth

2. The petition for condemnation alleged:

"1. That under and by virtue of the provisions of the National Recovery Act, approved June 16, 1933 (48 Stat. 195), the Fourth Deficiency Act, Fiscal Year 1933, approved June 16, 1933 (48 Stat. 274, 43 U.S.C.A. § 256a) ; the Emergency Appropriation Act, Fiscal Year 1935, approved June 19, 1934 (48 Stat. 1055) ; the Act of August 1, 1888, 25 Stat. 357 (U. S.C. Title 40, Sec. 257) ; The Act of February 26, 1931, 46 Stat. 1421 (U.S.C. Title 40, Secs. 258a to 258(e) ) ; and the Reorganization Act of 1939, 53 Stat. 561, in accordance with the provisions of which Plan Numbered I was submitted to the Congress on April 25, 1939, and was made effective on July 1, 1939, by Joint Resolution of June 7, 1939 (Public Resolution No. 20—76th Congress) ; and all other acts or parts of acts supplementary to or amendatory of the said acts, the Administrator of the Federal Works Agency is authorized to acquire on behalf of the United States of America by condemnation under judicial process such lands or interest therein in the State of Maryland as may be necessary in his discretion for military purposes and for other public uses ; * * *

"2. That under the authority in him vested by the said Acts of Congress, the Administrator of the Federal Works Agency has found and determined that it is necessary and advantageous to the interests of the United States of America to acquire the hereinafter described lands for the said public use by condemnation under judicial process, and the Administrator of the Federal Works Agency has selected and designated the hereinafter described lands for use in the construction, repair and improvement of a public highway and parkways in the State of Maryland designated as the Washington-Baltimore Parkway in Prince George's and Anne Arundel Counties, Maryland, and for other public uses. * * *"

The declaration of taking stated that "the public use for which said lands are taken is to provide for the construction of a public highway and parkways for a project designated as the Washington-Baltimore Parkway". The judgment on the declaration of taking, entered by Judge Chesnut, found "that the United States of America is entitled to acquire property by condemnation under judicial process for the purposes set forth and prayed in said petition".

clause, eighth section of the first article of the constitution of the United States, to the acquisition by the United States by purchase, condemnation or otherwise of any land in this State required for sites for custom houses, courthouses, post-offices, arsenals or other public buildings whatever, or for any other purposes of the government."

"35. Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State, but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands."

"36. The jurisdiction ceded shall not vest until the United States shall have acquired the title to said lands by purchase, condemnation or otherwise; and so long as the said lands shall remain the property of the United States when acquired as aforesaid, and no longer, the same shall be and continue exempt and exonerated from all State, county and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State."

In 1943 the Maryland Legislature passed two acts, chap. 644, now codified as sec. 32 of Art. 96, and chap. 687, now codified as sec. 46. They provide:

"32. The consent of the State of Maryland is hereby given, in accordance with the Seventeenth Clause, Eighth Section of the First Article of the Constitution of the United States, to the acquisition by the United States by purchase, condemnation, gift or otherwise of any land, rights of way, easements, etc., in this State required or needed by the United States for the construction of a parkway, highway, motorway or freeway between the City of Washington, D. C., and the City of Baltimore, Maryland, the consent hereby given to apply particularly to all parklands acquired or to be acquired in the name of the State of Maryland by the Maryland-National Capital Park and Planning Commission pursuant to the authority of Chapter 448 of the Acts of 1927, as amended. * * *"

"46. Notwithstanding anything contained in any of the sections of this Article to the contrary the State of Maryland hereby reserves as to all lands within the State hereafter acquired by the United States or any agency thereof, whether by purchase, lease, condemnation or otherwise, and as to all property, persons and transactions on any such lands, jurisdiction and authority to the fullest extent permitted by the Constitution of the United States and not inconsistent with the Governmental uses, purposes, and functions for which the land was acquired or is used. Nothing in this section shall be deemed or construed to restrict the jurisdiction and authority of the State over any lands heretofore acquired by the United States, or any agency thereof, or over property, persons or transactions on any such lands."

Sec. 46 (chap. 687 of the Acts of 1943) was probably inspired (a) by the decision of the Supreme Court in James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, which clearly recognized the possibility of concurrent legislative jurisdiction under Art. 1, sec. 8, cl. 17 of the Constitution, and (b) by the amendments of R.S. 355 effected by the Act of Feb. 1, 1940, 54 Stat. 19, and the Act of Oct. 9, 1940, 54 Stat. 1083, 40 U.S.C.A. § 255. In 1943 and 1944 the relevant portion of what is now 40 U.S.C.A. § 255 read as follows:

"Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be

acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

Pursuant to those statutes, on November 3, 1953, the Assistant Secretary of the Interior, on behalf of the United States, accepted concurrent jurisdiction over the Federal half of the Washington-Baltimore Parkway by filing a notice of such acceptance with the Governor of Maryland.[3]

A. Jurisdiction under Art. 1, sec. 8, cl. 17. Defendant argues in effect that since the United States Constitution has now been held not to require the acquisition by the United States of any jurisdiction in lands purchased by it with the consent of the Legislature of the State, the Maryland Act of 1943, ch. 687, quoted above, indicates that it was the intent of the Maryland Legislature to retain full jurisdiction in the State, and that the United States can acquire only a proprietarial interest over lands in Maryland. On the other hand, the Government notes that before the passage of the Act of 1943 the State had frequently ceded exclusive jurisdiction to the United States, and argues that by the passage of the Act of 1943 the Legislature only intended to reserve concurrent jurisdiction to the State, and now offers to cede concurrent jurisdiction to the United States, to be accepted or rejected by the United States in accordance with 40 U.S.C.A. § 255.

The Government's contention is supported not only (1) by the notice of November 3, 1953, set out in note 3 above, but also (2) by an opinion of the Attorney General of Maryland dated July 8, 1955, unreported [4], and (3) by

---

**3.** The relevant portions of the notice are as follows: "The Department of the Interior, under authority of the act of Congress approved August 3, 1950 (64 Stat. 400), has jurisdiction over land acquired for the Baltimore-Washington Parkway through acquisition, or by transfer from other Federal agencies, as provided in the aforementioned act. * * * The laws of the State of Maryland (Sections 28, 32 and 46, Article 96, Maryland Code, Annotated, 1951) permit the assumption of concurrent Federal jurisdiction over lands within the State acquired by the United States for public purposes. * * Accordingly, notice is hereby given that the United States accepts concurrent jurisdiction in respect of all lands which have been acquired by the Federal Government for the Baltimore-Washington Parkway within the State of Maryland. It is understood that the United States has exclusive jurisdiction over that portion of the Parkway which occupies lands within the Fort Meade Military Reservation."

**4.** After discussing the relevant statutes and cases, Attorney General Sybert concluded: "It is our opinion that exclusive jurisdiction of the lands in the Parkway acquired by the Department of Interior from the Federal agencies was and still is in the Federal Government. Jurisdiction over the other lands specifically acquired for the Parkway by the United States from the State of Maryland and from citizens of the State who owned them, in view of the express intention that concurrent rather than exclusive jurisdiction be taken by the United States, is in both the United States and the State of Maryland. We realize that the effect of what has been said is that on the Federal portion of the parkway, areas where Federal jurisdiction is exclusive will be interspersed with areas where the State has jurisdiction concur-

the report of the Interdepartmental Committee for the Study of Jurisdiction of Federal Areas within the States, which found, vol. 1, p. 98, note 2, that a part of the Federal half of the Baltimore-Washington Parkway located within the territorial boundaries of the State of Maryland is under the exclusive criminal jurisdiction of the United States, and a part under concurrent criminal jurisdiction.

■ Construing the phrase "other needful buildings" in Art. 1, sec. 8, cl. 17, the Supreme Court, in James v. Dravo Contracting Company, said: "We construe the phrase 'other needful buildings' as embracing whatever structures are found to be necessary in the performance of the functions of the federal government." 302 U.S. at page 143, 58 S.Ct. at page 213. That case dealt with land acquired by the United States for locks and dams. No case involving land acquired for the construction of a road has been cited or found, but an aqueduct carrying water to the District of Columbia, Reddall v. Bryan, 14 Md. 444, 478, appeal dismissed 24 How. 420, national cemeteries, Wills v. State, 50 Tenn. 141; steamship piers, United States v. Mayor and Council of City of Hoboken, D.C., 29 F.2d 932; aeroplane stations, United States v. City of Buffalo, 2 Cir., 54 F.2d 471, certiorari denied 285 U.S. 550, 52 S.Ct. 406, 76 L.Ed. 940, have been held to be within the purview of Art. 1, sec. 8, cl. 17. I hold that the land condemned for the construction of the parkway comes within the purview of Art. 1, sec. 8, cl. 17.

■ I also agree with the Attorney General of Maryland that the United States acquired concurrent legislative jurisdiction over the lands condemned in 1944 in Civil Action #2272 in this Court. It is not necessary in this case to determine whether the jurisdiction of the United States over other parts of the parkway, built on land acquired before 1940, is exclusive or concurrent. I agree with the Attorney General of Maryland that the Federal Government has at least concurrent criminal jurisdiction over all of that portion of the parkway built on lands owned by the United States however acquired.

■ Defendant contends that the police power of a state cannot be delegated to a private person, that the Federal Government stands in that category in this instance, and that the State Legislature cannot alienate, surrender, or abridge the right to exercise the police power of the State by any grant, contract, or delegation. This argument is answered by the fact that the Federal Government acquired the lands in question for a valid public use, within the purview of Art. 1, sec. 8, cl. 17 of the Constitution of the United States, which takes precedence over any state constitution or statute. The grant of concurrent legislative jurisdiction to the Federal Government by the Maryland

rent with the Federal Government. We point out, however, that as to the entire Federal portion of the Parkway, Federal jurisdiction will be clear, so that no hazard to the public safety will result. The proper delineation of areas of concurrent State authority will doubtless pose substantial problems in the administration of State law, but in view of the situation, and in the absence of any specific action by the United States to revest concurrent jurisdiction in the State of Maryland, we are obliged to recognize and apply the law as we understand it. The State of Maryland may exercise full criminal and civil jurisdiction over the lands over which it has concurrent jurisdiction with the United States, provided it does not interfere with the purpose and functions of the Federal Government. Atkinson v. State Tax Commission of Oregon, 303 U.S. 20, 58 S.Ct. 419, 82 L. Ed. 621. * * * If the Maryland laws and regulations conflict with the Federal laws and regulations, then the Maryland laws and regulations must give way to the Federal laws and regulations. The courts of Maryland, of course, do not have jurisdiction of crimes which are violations of the Federal law, but one act may be an offense against the law of both the State and the Federal Government, and in such case the courts of both have jurisdiction over the offense. Saxton v. People of State of California, 189 U.S. 319, 23 S.Ct. 543, 47 L.Ed. 833."

Legislature does not violate Art. 4 of the Declaration of Rights of the Constitution of Maryland. It preserves to the people of the State the right to exercise full civil and criminal jurisdiction over the land, consistent with the governmental purposes for which the property was acquired by the United States. The governmental purpose of maintaining a parkway carries with it the power to regulate traffic on that parkway.

■ B. Jurisdiction under Art. 4, sec. 3, cl. 2. The power to make and enforce the necessary rules and regulations for the management of federal property need not depend, constitutionally, on the acquisition by the Federal Government of legislative jurisdiction under Art. 1, sec. 8, cl. 17. Art. 4, sec. 3, cl. 2, provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."

In Robbins v. United States, 8 Cir., 284 F. 39, at page 45, the court said: "* * * we are of the opinion that the power of the government to regulate the traffic on those highways, as it has done by congressional enactment and rules thereby authorized, rests on the secure footing that it is a valid exercise of control over the property of the government, even though it is of the nature of police power, and that it is sustained by section 3, art. 4, of the federal Constitution, which entitles the government to make all needful regulations respecting its territory and property."

In King v. Edward Hines Lumber Co., D.C.D.Ore., 68 F.Supp. 1019, 1022, the court held: "The United States upon land of which it is the proprietor has complete power to exclude all persons therefrom, to issue special permits to certain persons to go thereon, to construct roads and prescribe the manner in which they shall be used, and who shall use them."

■ As we have seen, the Federal half of the Baltimore-Washington Parkway is a part of the National Park System. 39 Stat. 535, 64 Stat. 400; 16 U.S.C.A. §§ 1c, 2, 3. Congress therefore has the power to regulate the use of the parkway or to delegate that authority to the executive branch. The Assimilative Crimes Act, 18 U.S.C.A. § 13, is valid and applicable in this case.

■ (2) Defendant's second issue is "whether, as a matter of law, the standards used by the police on the day and date in question were sufficiently definite to establish guilt beyond a reasonable doubt". He questions "the reliability of the radar instruments that were being used, and the qualifications of the police personnel using it". The facts on this point are as follows:

On August 15, 1956, at 8:52 a.m., defendant was operating his automobile in the northbound lane of the Baltimore-Washington Parkway, near the Laurel-Bowie interchange in Prince George's County, Maryland. Beside a straight level stretch of that lane, Officer Andrus, of the United States Park Police, had set up his radar transmitter-receiver apparatus about 3 feet from the pavement facing the oncoming traffic at an angle of 10 to 15°. Officer Andrus was sitting in an automobile parked about 60 feet away with the speedmeter and recording graph in the car and with a good view of traffic on the road. He had been adequately trained in the operation of this radar equipment. He had tested the accuracy of the equipment immediately after he set it up in that location, and tested it again before he removed it, about two hours later, with satisfactory results both times. An electrical engineer at the Aeronca Research Laboratories, which makes periodic calibration checks of radar devices for the State of Maryland and the Commonwealth of Virginia, as well as for the United States Park Police, had checked the equipment on December 13, 1955. He checked the transmitter-receiver and

speedmeter again on September 15, 1956. On both occasions the equipment was recording accurately, with less than 1% of error at any speed.

On the morning of August 15, 1956, Officer Hawkins, operating the catch car, was stationed about 300 yards north of Officer Andrus. The police cars were in radio communication with each other. When defendant's automobile passed through the radar beam, the speedmeter and the chart registered a speed of 66 m.p.h. Officer Andrus noted the speed and the license number, called to Officer Hawkins to stop the car with that number and charge the driver with speeding, followed defendant's car with his eye until it was stopped, and wrote the speed and the license number on the chart. Officer Hawkins obtained defendant's name, address, etc., and gave him a notice of traffic violation. He identified defendant in court. The posted speed on the highway at that point was 55 m.p.h., the maximum permitted by the Maryland statute at that time. Signs reading "Speed Checked by Radar" were also posted along the Parkway, as required by sec. 3.28(d) of the National Capital Parks Regulations, 36 C.F.R. 3.28(d), 20 F.R. 8637, November 15, 1955. See also Maryland Code, Art. 35, sec. 99. One such sign was located well within the four mile limit.

Dr. John M. Kopper of the Johns Hopkins University, a recognized authority in the field of electronics, who has testified in radar cases in several states, explained the theory and operation of the radar device and showed that properly checked and set up such equipment records speed accurately, with any deviation tending to record a lower than actual speed.

Defendant cross-examined all the government witnesses but offered no evidence himself.

The use of radar equipment in determining the speed of a motor vehicle has been approved in a number of cases; e.g. Dooley v. Commonwealth, 198 Va. 32, 92 S.E.2d 348, appeal dismissed 354 U.S. 915, 77 S.Ct. 1377, 1 L.Ed.2d 1432; State v. Dantonio, 18 N.J. 570, 115 A.2d 35, 39, 40, 49 A.L.R.2d 460. See also 16 Md.L.Rev. 1, 17; 33 N.C.L.Rev. 343.

■ The use of this apparatus, like the use of speedmeters, cameras, and x-rays, has now reached such general acceptation by state legislatures, executive departments of state and federal governments, the courts, and the public, that it is no longer necessary for the prosecution to offer expert testimony, as it did in this case, to explain the theory and operation of the radar equipment, at least where there is a statute similar to Art. 35, sec. 99 of the Maryland Code or a valid regulation such as the one we have in this case, 36 C.F.R. 3.28(d). It is sufficient to show that the equipment has been properly tested and checked, that it was manned by a competent operator, that proper operative procedures were followed, and that proper records were kept.

The evidence in the instant case shows that all of these requirements were complied with. It also shows beyond a reasonable doubt that defendant was driving at least 65 m.p.h. where the maximum speed permitted was 55 m.p.h.

■ (3) Defendant's third issue—that the government failed to prove criminal intent on his part to violate the statute—is frivolous. It is similar to the plea of Ko-Ko in the ever popular operetta[5], and the Mikado's denial of that plea is in accord with Wharton's Criminal Law, 12th ed., Vol. 1, sec. 143, and other American authorities. The statute involved in the instant case does not require proof of any criminal intent.

Defendant's guilt has been established beyond a reasonable doubt.

5. Gilbert & Sullivan, The Mikado, Act 2.