128 N.J. Super. 199 (1974)
319 A.2d 733
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HAROLD FINKLE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 1974.
Decided May 6, 1974.
Before Judges CONFORD, HANDLER and MEANOR.
Mr. Morgan E. Thomas argued the cause for defendant.
Mr. Robert A. Rubenfeld, Deputy Attorney General, argued the cause for plaintiff (Mr. William F. Hyland, Attorney General of New Jersey, attorney (Mr. George F. Kugler, Jr., former Attorney General of New Jersey).
The opinion of the Court was delivered by CONFORD, P.J.A.D.
*200 Defendant challenges his conviction of driving 75.3 miles an hour in a 55 m.p.h. zone on U.S. Rt. 322 on May 5, 1973, primarily on the ground that the evidence of his guilt rests solely on a reading of his speed by a VASCAR device operated by a state trooper. The contention is that expert testimony as to the reliability of the device, which was not here presented before the trial tribunals, is an essential prerequisite for the admissibility of such evidence. The State takes the position that the scientific reliability of the device is a proper subject of judicial notice and that both the accuracy of the instrument used and the qualifications of the trooper who employed it were fully established by evidence adduced at the trial before the Municipal Court of Folsom Borough. The conviction in that court was affirmed in a trial de novo on the municipal court transcript before the Atlantic County Court.
The general reliability of the VASCAR device was held to have been established by expert proof by the Somerset County Court in State v. Schmiede, 118 N.J. Super. 576 (Cty Ct. 1972), where a conviction for a speeding offense proved by a VASCAR reading was affirmed. We arrived at the same conclusion, also by reason of the adduction of expert proof on the subject before the trial court, in State v. Salup, which is being decided simultaneously herewith. 128 N.J. Super. 209. There is no reported New Jersey case in which a conviction based on VASCAR-derived evidence has been reversed, or where VASCAR readings have been rejected as evidence, on account of the unreliability of the device.[1] The substantial question before us on this appeal is *201 whether sufficient indication of the general reliability of VASCAR is not now available to warrant the court's taking judicial notice thereof so as to dispense with the necessity in each of the scores (if not hundreds) of prosecutions annually based on use of the instrument of submitting expert proof to establish such reliability.
An understanding of the evidence in the present case and of our conclusions as to judicial notice require a description of the VASCAR device and of how it functions. The account which follows is derived from the record in State v. Salup, supra, the opinion in State v. Schmiede, supra, the testimony herein and documents hereinafter mentioned supplied the court by the State. The principles underlying VASCAR are simple. The apparatus is mounted in and powered by the battery of a motor vehicle. As the operator opens and closes a distance switch it measures the distance traversed by the vehicle during the interim and simultaneously feeds that information into a computer module. The distance is measured by an odometer module which is linked with the speedometer cable of the control car, but the measurement is not affected by the accuracy of the speedometer. The VASCAR unit also measures the period of time elapsing between the opening and closing by the operator of a time switch, and simultaneously feeds that information into the computer module. The switches can be opened and closed, as between distance and time, in any order. When both pieces of information (distance and time) have been stored in the computer there is within a second a computation by the computer module of the speed of a target vehicle, in terms of miles per hour *202 to the nearest one-tenth of a mile, represented by the ratio of the inputs of distance to time as fed into the computer. This figure is flashed to a screen on the apparatus visible to the operator.
The method of use of VASCAR by a police officer in detecting the speed of a target vehicle depends upon whether the clocking car is following the target car, is being followed by it, the cars are approaching each other from opposite directions, or the clocking car is parked alongside the highway while the target car passes by. VASCAR can be used in any of these situations. When both clocking and target vehicles are in motion during the maneuver the technique is as follows. The operator notes the moment when the target car passes a particular reference point, e.g., a bridge, signpost, tree, etc. To avoid problems of depth perception the shadow cast by the object is ordinarily used. At that moment the operator turns on the VASCAR time switch. When the target car passes a second reference point the time switch is turned off. The operator activates the distance measurement by turning the distance switch on and off as the clocking car passes the same two reference points.
When the clocking car is stationary, as in the instant case, it is necessary that the reference points be predetermined and that the clocking vehicle travel the course in advance, thus locking the distance traversed into the computer module before the time measurement is made. That measurement is made as the target vehicle passes from one of the reference points to the other within the observation of the operator.
Either the time or distance factor may be separately erased from the computer by depressing the appropriate button. Thus a parked police vehicle can check the speed of a succession of passing target cars with only a single distance input.
A more detailed description of the technical features of the VASCAR operation, derived from the expert testimony adduced in that case, is to be found in Judge Meredith's *203 opinion in State v. Schmiede, supra (118 N.J. Super. at 578-579).
The State's witness in the present case was Trooper Leach. His observation of the defendant's car was from a parked position in a diner driveway adjoining the eastbound lanes of U.S. Rt. 322. The observation took place at 8:30 P.M. on May 5, 1973. At 10:05 A.M. that day the trooper had calibrated the VASCAR unit in the following manner. Using a stop-watch, itself checked for accuracy by radio time, he fed 30 seconds of time into the unit and also a premeasured half-mile of distance, deriving a reading of 59.8 m.p.h. as against an accurate 60. On feeding 20 seconds of time into the unit (with the same distance input), he derived a reading of 89.8 m.p.h. as against an accurate 90. He adjusted the mechanism by turning a screw, thereby yielding perfect readings of 60 and 90 m.p.h. At 11:20 P.M. the same day another calibration check of the unit in the same manner again produced perfect readings without the need for adjustment.
Prior to taking his VASCAR reading on defendant's vehicle Trooper Leach had fed into the unit the distance on the highway between the driveway where he parked his car for the check and the shadow of the overpass by which State Highway 54 crosses U.S. Rt. 322, some distance westerly of the driveway. He parked at a point where he had a clear view of both the overpass and the highway in front of the driveway. As defendant's vehicle, traveling in the westbound lane, passed the trooper's position, he turned on the time switch and turned it off when the vehicle "hit the shadow" of the overpass. It was dusk, and the shadow was visible although the sun had already set. The unit showed a reading of 75.3 m.p.h. Thereupon the trooper overtook defendant, showed him the reading on the unit and issued him a summons for driving 75.3 m.p.h. in a 55 mile zone.
Trooper Leach testified that he had 25 hours of instruction and practice with the VASCAR unit and had passed the necessary tests before being certified as a qualified operator *204 of the apparatus by the Superintendent of the State Police in January 1973.
Defendant on cross-examination sought to impair the trooper's credibility by showing that the hour of the test was too late in the day to permit any discernible shadow from the overpass. He also implied that the difference between the time when the measured course distance was fed into the computer and that of the speed check was such as to render use of the distance factor unreliable. He testified that he could not have been driving at 75.3 m.p.h. because he customarily exercised great care to drive slowly on account of a serious heart condition; that when he noticed the lights of the police car behind him he was going "slightly over" 55 m.p.h. in congested traffic, and that he told the trooper when stopped that if the latter had told him he was going 60 m.p.h. "[he] would believe him," but for the trooper to tell him his speed was 75 m.p.h. he would "have to be crazy."
It should be noted that the issue before us is not whether the proofs justify a trial finding of defendant's speed at 75.3 m.p.h. but rather whether they support an adjudication that defendant beyond a reasonable doubt was proceeding at a rate in excess of 55 m.p.h.  the lawful limit. State v. Dantonio, 18 N.J. 570, 581 (1955).
The municipal court judge found the defendant guilty of driving 75.3 m.p.h. in a 55 m.p.h. zone. He gave credence to the trooper's testimony that there was a shadow from the overpass on the road, notwithstanding the sun had set at 7:58 P.M. He had previously overruled the objection of absence of expert proof as to the "scientific accuracy" of VASCAR on the basis of his own previous instruction concerning the instrument by the New Jersey State Police and by his study of the manufacturer's detailed manual. The County Court judge, in also finding, without the need for expert proof as to the reliability of the device, that defendant drove at 75.3 m.p.h., was of the opinion that VASCAR did not involve "a new scientific principle at all"; that it *205 involved only the principle "that speed is nothing more than distance over time", of which the court could take judicial notice. The fact that the particular machine used could accurately measure distance and time and compute the ratio between them in miles per hour was sufficiently established, in the view of the judge, by the trooper's testimony as to its calibration, and the State had met its burden of proof in respect of the operator's qualifications and as to the reliability of the manner of the actual use of the device.
The name VASCAR is an acronym for "visual average speed computer and recorder." Its prototype was invented by Arthur N. Marshall prior to 1960, and it has since about 1964 been manufactured and widely sold by Federal Sign & Signal Corporation of Blue Island, Illinois. The court in State v. Schmiede, supra, found that 6,500 VASCAR units were in use in the United States (as of 1972) (118 N.J. Super. at 580). Information supplied us by the State indicates that the device was in use in 43 states as of May 1971  by the various state police departments in most of them, and by numerous local police departments. An affidavit by Major Donald L. Smalley of the New Jersey State Police attests that in March 1974 that organization had 325 VASCAR units deployed throughout the State; and the affiant deposes that such units have been used in New Jersey since 1970, the experience of the Division being that "they have consistently proven to be a scientifically accurate and reliable instrument in determining the speed of motor vehicles."
The State has also submitted evidence that 153 VASCAR units have been sold and installed in local police patrol vehicles. Thus a total of 478 units are now operational in New Jersey and presumably in regular use in the enforcement of the statutes and ordinances governing the speed of motor vehicles.
The Franklin Institute of Philadelphia prepared the first engineering evaluation of the initial model of this device. "Evaluation of a Device for Checking and Recording the *206 Speed of a Moving Automotive Vehicle" (1960), by Walter E. Onderko. Comparison of the performance of the machine, in checking the speed of vehicles traveling distances of one-half, one-quarter and one-eighth mile, with calculated speeds obtained from stop watch time and measured distances showed deviations within one mile an hour. An error of 25 feet in judging the position of a vehicle with respect to a marker would produce an error of 2 1/2 m.p.h. based on a vehicle speed of 60 m.p.h. and a distance of one-eighth mile. With the distance increased to one-quarter mile the error is decreased to 1 1/2 miles an hour.
A pamphlet compiled by the New Jersey Institute for Continuing Legal Education and copyrighted by Rutgers University, entitled "Understanding the Breathalyzer, Vascar and Speed Radar" (1974), includes reprints of purported evaluations of VASCAR by the University of North Carolina Highway Safety Research Center (1968), the Iowa Highway Patrol (1968), the IIT Research Institute of Chicago, Illinois (1970) and the Michigan State Police (1967). The IIT study was made for the advice of the Florida State Department of Highway Safety. We have secured independent verification of the authenticity of the North Carolina report. We accept the reprints of the others as authentic in view of the academic credentials of the publisher and compiler. We have also examined an evaluation of VASCAR made for the Indiana State Police.
The consensus of these studies is that VASCAR is soundly engineered and that when properly used by an adequately trained operator over minimum distances of one-eighth to one-tenth of a mile VASCAR has a high degree of reliability in detecting the rate of speed of suspect motorists. From a parked position a minimum distance of 300 feet can be used. Average error is rarely found to exceed two miles an hour, and usually is within a range of 1 1/2 miles an hour or less.
Evid. R. 9(2) (d) provides that judicial notice may be taken of "such facts as are so generally known or of such *207 common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute"; also, under Evid. R. 9(2) (e), judicial notice may be taken of "specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources of reasonably indisputable accuracy." And see State v. Dantonio, supra (taking judicial notice of the reliability of radar as a speed detection device); State v. Johnson, 42 N.J. 146, 170 (1964) (taking judicial notice of the reliability of the Harger Drunkometer); State v. Arnwine, 67 N.J. Super. 483 (App. Div. 1961) (refusing judicial notice of reliability of polygraph); cf. State v. McDavitt, 62 N.J. 36, 44 (1972).
We are satisfied from the evidence herein and the materials which have been adduced before us that VASCAR now meets the criteria of the rule for judicial notice. The absence of extensive scientific writings on the subject, such as preceded judicial notice of radar, for example, is not an inhibiting factor. This device does not embody any presently novel scientific principle. Instruments for the automatic measurement of time and distance have long been familiar to our technology. More recent, but not less firmly established, are the numerous practical applications of computer and calculator science using electronic equipment. VASCAR simply integrates all these now well-established techniques into a composite instrument. There is no reason whatever to doubt its practical efficacy for the designed purpose in the hands of a properly trained operator; and the manifold instances, as here and in the tests reported in the studies cited above, in which calibration has demonstrated beyond dispute the accuracy of particular VASCAR instruments, confirm that the device is reliable beyond any reasonable doubt.
The foregoing conclusions gain added support from the widespread satisfactory experience of police departments here and across the country with VASCAR. Cf. State v. *208 Dantonio, supra (18 N.J. at 579); State v. Andretta, 61 N.J. 544, 549, 551 (1972) (police work with voiceprints).
In deciding to accord judicial notice to the reliability of the Harger Drunkometer the Supreme Court stated, in State v. Johnson, supra:
This conclusion cannot be affected by the fact that there are some, like defendant's witness in this case, who dispute the precise accuracy of the device and that there is a possibility of error. Practically every new scientific discovery has its detractors and unbelievers, but neither unanimity of opinion nor universal infallibility is required for judicial acceptance of generally recognized matters. [42 N.J. at 171]
Note also the caveat in McCormick, Evidence (1954), in discussing judicial notice, that the most frequent shortcoming of the courts in dealing with the doctrine is their failure "to employ the doctrine of judicial notice in this field [scientific and technological facts] to the full measure of its usefulness" (at 694).
Defendant challenges the use by this court of the data mentioned above on hearsay and due process grounds. In the latter regard he asserts he has been deprived of his rightful opportunity to confront and cross-examine the authors of the several reports mentioned. However, the very process of determination of whether grounds exist for the taking of judicial notice implies discretionary resort by the court to relevant authoritative literature in the particular field without any need for putting it through the adversarial trial process. See, e.g., the extensive consultation of relevant literature in State v. Dantonio, supra (18 N.J. at 573, 575, 576, 578-579), where the court decided to take judicial notice of radar as a speed measurement device. Evid. R. 10(2) provides that
In determining the propriety of taking judicial notice of a matter or the tenor thereof, (a) any source of relevant information may be consulted or used, whether or not furnished by a party, and (b) no rule of evidence except Rule 4 [discretionary exclusion of evidence whose probative value is outweighed by risk of undue consumption of time or undue prejudice] or a valid claim of privilege shall apply.
*209 Copies of all the material considered by the court have been furnished to defendant, and he has employed the opportunity to attack its probative force as well as its admissibility. See Evid. R. 10(1). It has been implicit that the court would have received from defendant any authoritative data disparaging the reliability of VASCAR. None has been received, nor does the court know of any. The contentions in respect of the hearsay rule and due process rights are without merit.
We find that the conviction of defendant in the County Court of exceeding the speed limit is sustainable on the evidence adduced. In doing so, however, we point out that the factor of potential margin for error in VASCAR readings inherent in the intervention of the mental and physical processes of the operator of the device may well justify a court in declining to find guilt beyond a reasonable doubt where the reading is relatively close to the legal speed limit. But here there is no such problem in view of the wide disparity between the 55 m.p.h. limit and the 75.3 m.p.h. VASCAR reading. We also emphasize that in every future case there must be satisfactory proof of the good working order of the particular VASCAR instrument used and of the qualifications of the operator.
Affirmed; no costs on this appeal.
NOTES
[1] In People v. Leatherbarrow, 69 Misc.2d 563, 330 N.Y.S. 2d 676, 679 (Cty. Ct. 1972), a conviction of speeding based on a VASCAR reading was reversed for absence of "any testimony concerning the theory and mechanics of Vascar's operation or the scientific facts and principles upon which its operation is founded". This, despite the court's obesrvation that its "independent research has shown Vascar to be a relatively simple and undoubtedly accurate mechanism for determining vehicular speed." Ibid.

In People v. Persons, 60 Misc.2d 803, 303 N.Y.S.2d 728 (Ct. Sp. Sess. 1969), there was a speeding conviction based on a VASCAR reading supported by expert proof as to its reliability. The judgment was affirmed in an unreported opinion of the Monroe County Court March 24, 1970 wherein the court, although expressing full satisfaction with the reliability of the device, indicated that it would nevertheless be necessary for the State to adduce expert testimony on accuracy in each future case where reliance was solely on the instrument.