Del Giorno, M.
The People, on the complaint of police officer Henry Herzog, charge that the defendant, Rose Sachs, on July 22, 1955, at about 1:10 p.m., operated a motor vehicle eastbound along Union Turnpike near Grand Central Parkway, a public highway in the County of Queens, City of New York, at 44 miles per hour, whereas the posted permissible speed is 30 miles per hour, all in violation of section 60 of the traffic regulations adopted by the traffic commissioner of the City of New York.
Likewise, the People, on the complaint of police officer James Jamieson, charge the defendant Dwyer with operating a motor vehicle on July 24, 1955, at about 2:50 p.m., along Union Turnpike and 232nd Street, in Queens County, at 44 miles per hour, whereas the speed limit set by the same regulations is 30 miles per hour.
Both defendants pleaded not guilty.
The various proceedings and trial were adjourned a number of times.
In both these cases the speed charged against these defendants was checked not by the commonly known speedometer used either in police autos or motorcycles, but by radar equipment.
The validity of radar used by the New York City Police Department since about June 14, 1955, to check the speed on motor vehicles on our city highways was contested by the defendants, who in addition thereto also raised the issue as to whether the radar unit used had properly recorded the speed of their vehicles instead of some other vehicles which were within its so-called zone of influence.
This was made a test case, and upon its results hinge the ultimate fate of many others which have been adjourned to await this decision.
The trial of these cases took place on September 9, 1955, October 5, 1955, and October 7, 1955. The minutes run to over 300 pages. The court obviously can only summarize this testimony. One fact stands out importantly. The police department of the City of New York, about the beginning of 1955, embarked on a large-scale use of radar to check the speed of motor vehicles in place of the familiar, never liked but equally respected motorcycles and automobiles heretofore used.
It proceeded with the anticipated use of radar by establishing a radar unit composed of picked policemen, and trained them for their newly assigned job for over four months.
The training was given by the engineering bureau of the police department, City of New York.
*150 Classes were held at 400 Broome Street. Radar equipment was placed before the policemen and they were taught how to make it operate. They were given a technical understanding of its method of operation.
Then for a further period of two months, actual road tests were given to the officers on the manner in which the radar unit could pick up moving vehicles in its radar scope and identify them.
These instructions and on-the-job training were given by Acting Captain Maher and Chief Engineer Jacob Katz and Mr. Norman Boyle, an engineer, all of the police department.
Mr. Jacob Katz is the well-known and highly respected chief engineer of the police department. Mr. Katz did not testify. Mr. Norman T. Boyle who did testify stated that he is a graduate of Villanova in electrical engineering and of Fordham Law School. His degrees were B.S. in E.E., LL.B., and P.E. He has been with the police department twenty-five years. He particularly testified as an expert on the accuracy of the method heretofore exclusively used in testing the speedometers on motorcycles or radio cars.
This part of the testimony left no doubt as to the importance the police department places upon the proper training and the acquisition by its officers of the necessary technical understanding of the working, and setup of the radar unit. Whether one accepts the new mode of apprehension or not, one must give due credit to the sensitivity of our police department to the rights of motorists, as indicated by the care and thoroughness of the training of the officers in the radar unit.
The testimony on the part of the People (we will speak of the Sachs case, since it is similar to the Dwyer case, except in the defense offered) shows that a radar unit was in operation at the time of the apprehension of the defendant. The police use two cars for this detail. One is known as the radar car and the other as the apprehending car. Patrolman Herzog was in charge of the radar car.
From the officer’s testimony we can develop the preparations made to check on and apprehend a speeding vehicle.
On the day in question he was operating car number 78, the radar car. He placed his car off the roadway of Union Turnpike just about where the curbing would be, and parallel with the roadway.
Patrolman Wilkening, who was operating the other car known as the apprehending car, stationed himself at Union Turnpike ¡and 235th Street, about 1,000 feet ahead of Patrolman Herzog. *151 Both cars have intercommunicating radio phones, and both cars could see each other.
In the radar car there were three electrically operated instruments used to check by radar the speed of vehicles on the highway. These are: (1) a transmitter-receiver. This is mounted in the trunk of the car about three feet above the highway. It sends out microwaves towards vehicles approaching the rear of the radar car. It also receives waves reflected from a moving object which comes through its zone of influence which is approximately 150 feet to 300 feet, depending on the height of the apparatus from the ground; (2) a speedmeter which records the speed of the vehicle in the zone of influence. It is located on the dashboard directly in front of the officer sitting at the steering wheel; and (3) the graphic recorder, which is set up on a special stand in the front of the car, directly to the right of the operator of the vehicle. It makes a permanent record on special graph paper of the speed of the vehicle within the zone of influence.
These are all connected with each other by means of electric cables. They compose the elements required for this operation, namely, sending out of microwaves to catch a speeding vehicle, receiving of microwaves (of different frequency) which are reflected to the same unit by the moving vehicle, which automatically and simultaneously are indicated visually on the speedmeter for the operator to see and recorded permanently in red ink on the graphic recorder. These instruments operate on a special independent six-volt battery.
When the two cars have chosen their position the radar unit is placed in operation. But to determine its accuracy, as well as its zone of influence, then another officer operating a police motorcycle with a solid shield in front of it, extending about the width of the bars and from about one foot above the ground to about five feet above the ground, makes test runs in each lane of the roadway on the side of the radar car. He passes through the zone of influence to the apprehending car. There he calls the radar operator on the radio phone and they compare the speed on the motorcycle and that indicated in the radar car. The speed must check before the unit is placed in operation for enforcement of the speed regulation. In this manner the extent of the zone of influence in approximate feet is also determined for each lane.
The speed of the motorcycle is recorded on the graph and is so marked. At the end of the tour, this operation is repeated, and a notation of the test is permanently recorded on the graph.
*152 The court doubts that such care, as is fully evinced here, is taken in any other municipality to assure that so far as human concern can guarantee, an honest charge against a motorist is made.
The People called as a witness Dr. John M. Kopper. He is an electrical engineer engaged in the practice of electrical engineering at Johns Hopkins University. He has been a member of the staff since 1937. He has a Bachelor of Engineering degree from Johns Hopkins, and a Doctor of Engineering degree which he received from the same university in 1944. His professional experience has consisted largely of research and development in the field of electrical engineering in many phases of that field. Presently he is engaged in testing certain automatic controls which are a part of radar systems and which are of a classified nature.
He was engaged with the National Advisory Committee at their laboratory at Langley Field, Virginia, for one and one-half years and with the Westinghouse Electric Corporation for two years, in both cases in the field of instrument development, high-voltage engineering, the nature of which was in instrumentation and automatic computers. He wrote, in 1955, an article with respect to the use of the electromatic speedmeter for the North Carolina Law Review.
He was offered as the scientific expert.
Briefly, he testified that he has been previously called as an expert witness by the police departments in Yonkers and New Rochelle, New York, and in New Jersey.
He stated that he is acquainted with the components of the radar set in question and the principle upon which it operates.
He stated that in the transmitter-receiver there are a group of vacuum tubes, a group of resistors, a group of capacitors and wiring; in the speedmeter there is a little magnet, coil of wire, a spring and some resistors; and in the graphic recorder there are wiring, resistors, a stylus which records in red ink on a graduated chart the speed of vehicles passing through the zone of influence. These are all interconnected by cable to a wet battery as previously indicated.
Dr. Kopper also made the point that if the battery becomes weak or any tubes deteriorate that the recording of the speed is lower than the actual speed of the moving vehicle and will always be in favor of the vehicle whose speed is being checked.
He further testified that the transmitter-receiver (the primary instrument in the whole setup) has its operation based on two *153 ideas, one of which is the Doppler principle, which acts in the following way — it has a transmitter which sends ont a continuous wave of electromatic wave energy which is called the beam. This beam upon striking a moving object is reflected back to the antenna within the instrument and passes into the receiver part of the transmitter-receiver. This part which is reflected back may be called the echo ■ — • like the echo of a voice thrown against a solid wall. It has a frequency which is different from that which was sent out. This is called the “ Doppler effect ”.
The next principle upon which the machine is based is the “ phenomenon of beats ”. As in music where one might strike two adjacent keys on a piano we would hear two tones that would mix together and also hear alternate increases and decreases of the sound intensity. In the transmitter-receiver there is a mixing of the two signals, one of which is transmitted out from the machine to the moving vehicle (which Dr. Hopper calls the “ target ”) and is reflected back, and the other which is sent simultaneously from the transmitter to its own receiver in the same box.
Thus, within the transmitter-receiver we now have two different signals with two different frequencies, one the transmitted frequency and the other the reflected frequency (which is slightly higher). Those two mixed together produce the phenomena of beats.
It is the function of the instrument to measure the number of those beats per second, and there is a direct and linear relationship between the number of beats per second and the speed of the on-coming vehicle, so that the major part of the transmitter-receiver is taken up with measuring the beats that it “ sees This energy-combine passes to a vacuum tube voltmeter.
The vacuum tube voltmeter has as its purpose the measuring of a voltage existing across a certain condenser and resistor in the transmitter-receiver. The voltage which appears across this resistor is directly proportional to the number of the beats that the radar speedmeter sees, and consequently, the speed of an oncoming vehicle.
The vacuum tube voltmeter measures voltage in a certain way which involves an electronic circuit, and in the part called the output switch part of the electronic circuit indicating instruments may be connected. One such instrument is the speed indicator (speed meter) in which the needle will move and indicate speed on a graduated scale; and the other is the graphic recorder which makes a permanent record of how the voltage across this condenser varied with time and with the speed of vehicles.
*154 There was a long and protracted, albeit, able cross-examination by the two defense attorneys, but to the satisfaction of the court, Dr. Kopper proved, in answer to specific questions, that he was not only an eminent electrical engineer but one who knew every phase of this new and great instrument which has transmitted the business of apprehending speeders from the mechanical into the realm of fantasy and wonder.
On further cross-examination, Dr. Kopper asserted that the electromagnetic wave, which has an effective range of about 150 feet to 200 feet, forms itself somewhat like a cone with its point starting in the transmitter. The waves spread in all directions to the rear, upward and sideways — the upward and side directions covering about half the distance of the direct rear waves. He stated that the beam starts at zero and widens, as would a cone as it moves away from the transmitter; and that objects moving in the air within that zone of influence could conceivably be reflected back into the transmitter in preference to the moving vehicle coming from the rear, and since the apparatus is built to register the faster vehicle of a comparative large size, a plane’s speed could be recorded, or even a very large bird, and thus innocently a vehicle on the road might be charged with the speed it was not making.
Dr. Kopper also agreed that if the radar unit is not placed in proper position in relation to the roadway, part of the cone could spread to the opposite roadway, and the apparatus may thus pick up vehicles travelling in the opposite roadway, which, if going faster than the oncoming vehicle could possibly cause such oncoming vehicle to be charged with the speed of that other vehicle. He stated, however, that such happenings may hardly take place if the instrument is placed properly by the officer in charge.
These surmises at best are matters for cross-examination and do not affect the accuracy of the radar instruments or the efficacy of the operation. To this court it seems that these suppositions are in the realm of “ might be ”, and need receive no further consideration in the light of the facts in this case.
The court has gone at length into the testimony of Dr. Kopper in order to establish (at least to its own satisfaction and, it is hoped, to the satisfaction of other tribunals) the fact that the radar set herein used is an accurate and proper instrument for detecting speed violations on our highways.
Thus, having established to my own satisfaction that radar speed-checking is in every way a competent electronic method of *155 enforcing this phase of the law, I find it pertinent now to discuss the manner and method of apprehension employed by the police.
After the apparatus has been tested with the motorcycle, the officer in the radar car sits at the wheel of his car. He turns on the switch which operates the apparatus. He observes traffic approaching from the rear through the rearview mirror. He has already established the approximate distance at which a car in a given lane will enter the zone of influence. He now observes a car which he believes is speeding and reads the speed; and as the car passes, notes its license, make, color and any other identifying particulars about the vehicle. He uses a radiophone and relays the information to the apprehending car. He keeps his eyes on the vehicle all the way to the apprehending car. He then receives from the apprehending car the description of the vehicle stopped by the apprehending officer. These are tallied and when found to be the same, the apprehending officer then issues a summons for the speed recorded. The complaint is later made by the radar car officer who is the complainant.
No doubt that mistakes either in description, visual observation or because of extraneous interference within the zone of influence, may be made. However, these are all matters for cross-examination and defense. None of these place in question the accuracy of the radar instruments used.
In the light of the scientific explanations given at the trial it may be fair to conclude that hereafter the accuracy of radar as used herein should be accepted as an established fact. If that were not to be judicially accepted, it would then require the testimony of a scientific expert with the attendant prohibitive costs in every case. When one considers the thousands of such cases in our great city alone, it is simple to conclude that the use of radar would die aborning.
To elucidate on such conclusion the court will here draw an analogy between the method of proof required in those cases where a summons was issued by a motorcycle officer not using radar and one given under the radar setup.
In the first case, at the trial, the officer testifies in substance that he placed his motorcycle at a specified distance behind the speeding vehicle and between two locations he maintained that distance and clocked the defendant at a speed not less than the speed in the complaint.
Then he is required to prove that his speedometer was tested for its accuracy every fifteen days. If he witnessed the tests he says he was present and witnessed the tests. If not, either *156 the mechanic who made the tests or the officer who witnessed them, will so testify. He will say that the result of both tests showed the speedometers to be accurate.
Then he is required to describe the manner in which the test was made to determine the accuracy of his speedometer. He describes that. The usual method, he will say, is to detach the speedometer cable from the rear wheel of his motorcycle and attach it to a speedometer testing machine which has a master speedometer head. Both speedometers are operated by a motor at the same time. The speed of the motor is controlled by means of a rheostat. If the speeds match the speedometer on the motorcycle is considered accurate.
"What the courts have accepted as being correct and a proper point to go forward from, is the accuracy of the master speedometer. We know from experience that it is under supervision of competent engineers at all times and subject to methodical factory inspection. If one did not accept the constant accuracy of the master speedometer, we would have been faced with the necessity of proving each case with a factory expert. That we found was not necessary. We had to have a point of start and a point of faith. Our faith was in the accuracy of the master speedometer.
Now, in the use of radar we find that the instruments are as perfect as scientific and electronic ingenuity can make them. Dr. Kopper has made that abundantly clear. The defense attorneys do not dispute the efficacy of the instruments used, nor their accuracy when a proper target is within its wave scope.
Therefore, it seems to this court that henceforth, when a radar speed case is presented that the court should accept the scientific certainty that radar is a proper instrument for checking the speed of vehicles on our roadways, which instrument is uncanny but basically correct and well-nigh perfect.
It is from that point of acceptance that the court should require operative and mechanical proof to the effect that —
1. The radar car was properly set up in its detecting location.
2. The radar instruments used were worldng.
3. The apprehending car was set in its own location.
4. That both cars were visible to each other at a reasonable distance.
5. That a motorcycle or other vehicle equipped with a calibrated speedometer had been used at the beginning and the end of the tour to test the accuracy of the radar set; the manner in which tests were made.
*157 6. The graph sheet shows the results of these tests.
7. That the speedometer on the motorcycle or other vehicle had been tested in the manner hereinbefore described and found to be accurate.
8. The radar car officer observed the speeding vehiclesas well as any other vehicle, and his description of the speeding vehicle.
9. The defendant was apprehended, and what the apprehending officer did to insure- that the proper defendant was served with the summons.
It would seem that the defendant under this method of proof is fully protected in his rights.
In the case at bar all this testimony was adduced.
For their defense the defendants offered their testimony and that of witnesses to the actual incident, and also offered the testimony of Mr. Thomas Baasch, who stated he was an engineering physicist and a graduate of Polytechnic Institute of Brooklyn in 1951.
Mr. Baasch stated that he had undergone the Navy course in radar for ten months during the war and worked with radar at his former place of employment, Sylvania Corporation.
He was accepted by the court as an expert with limitations since the court felt he was not sufficiently trained in the theory and practice of radar equipment.
He agreed that the beam sent out by the apparatus would be at least 75 feet wide at its furthest point in the zone of the radar influence.
He agreed with Dr. Hopper that such beam could cover both portions of a 60-foot roadway, depending on its position, however.
He made the point that a car going the opposite way or coming along the same way as the apprehended car, but travelling much faster might affect the results on the graph by registering the faster speed against the apprehended slower car which was actually going at a slower pace.
This deduction, although speculative on his part, might very well be correct and may be offered in defense by a defendant, but it does not at all affect the accuracy of radar when properly used.
Let it be said here that in this court’s opinion many more defenses can be interposed to radar speed interception than can tó a motorcycle apprehension.
Here at 44 miles per hour, everything takes place in about three seconds, including the graph registration of speed, the view of *158 defendant’s vehicle through a rearview mirror, looking at speedometer, noticing traffic conditions, the description of speeding vehicle and talking on the radiophone.
Therefore, those testifying for the People must be sharp of eye and mind, alert and perceptive every instant, and discerning and careful at all times with reference to their description of events and conditions. I find that the officers in this case met these requirements.
Returning to the case proper, the defendant Sachs testified in substance that she travelled on the left lane and had stopped for a red light at Springfield Boulevard while a Buick of similar color to hers stopped also, with other cars in back of her. Traffic was heavy. They started together after the light changed. While travelling at equal speed, two cars were honking behind her. She looked to the right to see if she could move to her right when the other Buick passed ahead and also a truck. The truck passed first, then the Buick, then another car, while a fourth came alongside of her when she was stopped. This all happened before reaching the overpass of Grand Central Parkway over Union Turnpike. She said the other Buick turned off Union Turnpike and entered Grand Central Parkway at a point after the overpass over Union Turnpike. She stated that her speed was the permissible 30 miles per hour. She claimed she looked at her speedometer.
Her daughter, one of seven passengers in her car, gave substantiating testimony generally, but also said that the cars that were alongside of her mother’s car were certainly going more than 30 miles per hour.
Another witness, Max Blue stein, called to rebut the claimed point of vantage of the police radar car stated that he passed there twice a day and although the contrary opinion was expected by the defendant, he stated that if a car was parked on the sidewalk the officer could see behind, but he did not know how far.
In rebuttal, officer Herzog explained that he parked his car beyond the south curb of Union Turnpike facing east with the front of his car just even with the overpass of Grand Central Parkway. In that manner the front part of his vehicle was on the cobblestone sidewalk under the overpass, and the back of the car was on the part adjoining the sidewalk, which was covered with grass. He could see 500 feet behind him. The officer admitted that the graph showed a truck had passed at about that time.
*159 On October 7, 1955, the case was continued as to defendant William Dwyer. Officer James Jamieson, with about the same radar training as Officer Herzog, was at the radar unit. He was parked at 232nd Street and Union Turnpike, eastbound.
It was conceded that he had sufficient training and that he had all the necessary apparatus and that it was set up properly. The court would not accept the last concession, requiring the officer to prove that point.
He explained the equipment he had and the manner he set it up (same as Officer Herzog in the Sachs case) and that he was parked alongside of and parallel to the curb. The motorcycle tests were made. The apprehending car was about 1000 feet ahead of him.
He said he observed the defendant’s car through the rearview mirror about 300 feet to the rear of his car, proceeding east. About 150 feet to the rear, defendant’s car entered the zone of influence and was recorded as going 44 miles per hour. He, the same as Officer Herzog did, kept the defendant’s vehicle under observation until it was stopped by the apprehending car. He further stated there were no other cars behind this vehicle, except the nearest one which was seventy-five feet distant.
On cross-examination, the officer was asked as to what the red ink markings on the graph paper represented. He explained that while the paper moves vertically from top to bottom, the needle point with red ink moves laterally from zero upwards depending on the speed; that as soon as the speeding vehicle leaves the zone of influence it starts to go down, but if another car enters the zone of influence the needle will instantly halt its downward path and rise to indicate the speed of the other car. It will fluctuate up and down while there are cars leaving and entering the zone of influence. This fluctuation comes about when varying speeds are noted by the radar set, but continues constant when speed is constant. Thus each car causes its own markings, called blips ’ ’, which have a sharp tangent point or roundish or straight end depending on the speed and shortness of time the vehicle remains in the zone of influence, and depending on what markings the “ blip ” reaches on the graph paper, that indicates maximum speed.
The important point to be observed on the graph paper is the vertical distance between the red lines. For instance, a greater distance between the lines represents the magnitude of the target which may be a large moving van or several cars following each other in close proximity at various speeds. Each peak of the *160 curve generally represents the maximum speed of a vehicle. Where more than one peak or “ blip ” occurs between the time the stylus starts and returns to zero that indicates if on an upward stroke that an overtaking* car at a higher speed has reached the zone of influence before the other car has passed out of the zone of influence. A slower car would not be registered but the faster ones will. Nevertheless, the “ blip ” formed by the apprehended car has taken its curve on the graph and is definite and ascertainable. Here the visual observations made by the officer must be closely scrutinized by the trier of the facts.
At the end of the People’s case, the defendant rested and moved to dismiss.
There were so many and various tangents brought into the case, but the court feels that what has been reported herein is the meat and substance of these two cases. Although the court has referred to the testimony only, it has also scrutinized the points made in the memorandum of law and facts submitted by both the People and the defendant Sachs.
There is no doubt, as was contended by both defendants that radar is a new device for detecting* speed. However, it has received such intensive testing as to its accuracy in our armed forces, and by scientists everywhere who are every day trying to penetrate the mystery of the unknown — the space above the earth — and in so many other ways, that it has now acquired the dignity of acceptance in all fields; guns shoot at unseen targets by radar, planes fly blind by radar, missiles find their targets unknown miles away by radar, ships of all kinds receive their bearings by radar, our national defenses against air attacks are manned by radar. The word radar and its accuracy today is as commonplace as bread. Like bread it has become the staff of our life. We depend on it for our very existence. Our country spends countless billions of dollars on radar equipment and installations set up for our national defenses. We must accept that radar is here to stay. Its youth does not diminish its marvelous accuracy and complete acceptance. That acceptance, in my mind, is no less for the radar setup used herein by the police.
An examination of the reported cases discloses that in all instances where an expert witness was used to describe the basic components and operation of the radar equipment used, that the radar set was accepted as an accurate device for measuring speed and a conviction followed. (People v. Offermann, 204 Misc. 769; City of Rochester v. Torpey, 204 Misc. 1023; City of Buffalo v. *161 Beck, 205 Misc. 757; People v. Katz, 205 Misc. 522; People v. Sarver, 205 Misc. 523; also, State v. Moffitt, 100 A. 2d 778 [Del.], State of New Jersey v. Dantonio, 31 N. J. Super. 105.) In the latter case, which was affirmed by the New Jersey Supreme Court, Dr. Kopper also testified as an expert.
It is very pertinent to our case and the position this court takes with reference to the acceptance of radar as a competent means of checking speed of vehicles on the highways that the following portion of the decision in the Dantonio case (18 N. J. 578-579, supra) be quoted: 1 ‘ Since World War II members of the public have become generally aware of the widespread use of radar methods in detecting the presence of objects and their distance and speed; and while they may not fully understand their intricacies they do not question their general accuracy and effectiveness. Dr. Kopper has pointed out that, in contrast to other radar methods, the method actually used in the speed-meter is rather simple and has been adopted by many law enforcement bodies; a recent tabulation indicates that speed-meters are being used in 43 States by almost 500 police departments. See Radar Traffic Controls, 23 Tenn. L. Rev. 784 (1955). The writings on the subject assert that when properly operated they accurately record speed (within reasonable tolerances of perhaps two or three miles per hour) and nothing to the contrary has been brought to our attention; under the circumstances it would seem that evidence of radar speedmeter readings should be received in evidence upon a showing that the speedmeter was properly set up and tested by the police officers without any need for independent expert testimony by electrical engineers as to its general nature and trustworthiness. See Professor Woodbridge, supra, at 814: ‘ Under the Uniform Rules of Evidence, already approved by the American Bar Association at its 1953 meeting, judicial notice “ shall be taken without request by a party ... of such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute.” Radar speed meters are now in this category. - Why should the time of experts be wasted and the expenses of litigation be increased by compelling such men to appear in court after court telling the same truths over and over? While it is agreed that every reasonable doubt about the accuracy of new developments should promptly be resolved against them in the absence of expert evidence, there is no longer any such doubt concerning radar. Rather, the applicable maxim should now be, “ What the world *162 generally knows a court of justice may be assumed to know.” ’ See, also, Baer, supra, at 381 where Professor Baer, a member of the New Jersey Bar and the faculty of the University of North Carolina School of Law, expressed the view that there was now 1 more than adequate knowledge of the operation and accuracy of radar speedmeters in the area of science to which these devices belong to warrant their being accorded judicial recognition without the aid of expert testimony or legislative direction.’ Cf. R.S. 39: 4-50.1; State v. Hunter, 4 N. J. Super. 531 (App. Div. 1949), Id., 12 N. J. Super. 128 (App. Div. 1951).” In conclusion, and after exhaustive study of all the testimony in this case as to the theory in the operation of radar, this court concludes that expert testimony as it relates to the accuracy of the radar equipment presently used by the police department may be dispensed with in future prosecutions. In the Sachs case I do not find the officer’s testimony and that of the radar apparatus sufficiently controverted and find her guilty as charged. Likewise I find the defendant Dwyer guilty as charged, being satisfied 'that the officer’s observations added to the graph reading were accurate.