OPINION OF THE COURT
Susan R. Shimer, J.
Defendant was charged with violation of subdivision (b) of section 1180 of the Vehicle and Traffic Law, to wit traveling at a speed of 75 miles per hour in a 55-mile zone. After the People’s case, the defense moved to have the case dismissed on the grounds that a prima facie case had not been established, since the radar equipment used was not tested properly, relying on People v Perlman (89 Misc 2d 973). The court reserved decision on that motion and the trial was completed. *916 The court stated it found defendant guilty of speeding, but would consider defendant’s prior motion as a motion to set aside the verdict. The court reserved decision pending receipt of a motion in writing. It explained that it had read Perlman, had serious reservations about the case, but had not heretofore been faced with a motion to dismiss on this basis, and accordingly wished to give careful consideration to defendant’s motion.
Certain parts of the trial testimony are relevant to a consideration of this motion, and accordingly will be summarized here. The testimony established that when the trooper stopped to observe traffic, he set up a MR7 type radar unit. Before putting it into operation, he made various calibration tests. These included internal calibration tests as well as tests with two tuning forks.
The testimony established that the two tuning forks were kept in individual cases, which, in turn, were in a large case. The tuning forks themselves were checked for accuracy in March, 1977 and, according to the trooper’s testimony, other calibrations of the tuning forks after the date of defendant’s alleged infraction indicated that they remained accurate. In order to test the radar with the tuning forks, the tuning forks were struck on a nonmetalic object and then placed in front of the radar’s antenna. The trooper stated that if the radar is functioning properly, it shows a readout of 35 when one tuning fork is so manipulated and a readout of 65 with the other tuning fork, and the radar did so here.
After completion of his tour, the trooper again checked out the radar using various internal calibration tests and the same tuning fork tests. All tests indicated to the trooper, a trained radar operator, that the radar was functioning properly. He does not remember if he moved the car between the performance of tests at the beginning and end of his tour.
As defendant states, the "crux of the Perlman case is that in order for a Court to rely upon evidence adduced by way of a radar device that device must be tested by means of a comparative analysis and not by means of internal tests.” The court in People v Perlman (89 Misc 2d 973, 980, supra) stated: "To accept less and to rely solely upon the internal calibration by the machine itself, without the testimony of an expert witness, is to render an injustice to the accused, and to encourage a 'slavish adherence’ to an electronic device which is poten *917 tially subject to inaccuracies and failure, as are all machines and human beings alike.”
Perlman as, of course, defendant recognizes, is a lower court decision, i.e., the District Court in Suffolk County, and this court is not bound thereby. The decision in that case must be contrasted with that of the appellate court in People v Lynch (61 Misc 2d 117, 119) cited in Perlman. There, as in Perlman, and as here, "no test vehicle was used to pass through the radar’s field of influence” (see Perlman, supra, p 977). Instead an internal calibration test, a 50-mile per hour tuning fork and a 30-mile per hour tuning fork were used (see Lynch, supra, pp 118-119).
The appellate court in People v Lynch (61 Misc 2d 117, 120, supra) stated: " 'While our higher courts have not spelled out the exact limits to which the accused speeder may go upon trial to plumb the accuracy of the testing devices, this court is not prepared to cast the burden on the People of offering proof of the accuracy of both the calibrated tuning fork and the speedometer of the test car beyond the simple comparative analyses made in the instant case. Beyond such simple tests must lie tests of the devices used to test other measuring devices. Beyond these tests must lie metal fatigue tests, conductivity tests, and electrical time-lag tests involving the variant components used in all of the testing devices, and so on and on. These tests must end somewhere. The oft-heard layman’s opinion that the enforcement of the law can be frustrated by a "legal bag of tricks” must not be encouraged by slavish adherence to hypertechnical requirements of myriad testings of the components of every device used to measure accuracy of every other measuring device.’ ” (Emphasis added.) The court in People v Perlman (89 Misc 2d 973, 978-979, supra) was troubled by the fact that "[t]he People seek to have the court conclude that the radar device was operating accurately and had been adequately tested on the date in question, where the internal calibration device contained in the equipment itself, and operating from the same electrical source, confirmed that the equipment was functioning properly, where no external test had been performed before or after a particular setup, and where no graphic record was kept of the radar test. Furthermore, no proof had been offered at trial of the testing of this equipment by expert technicians within a reasonable proximity of the date in question, the radar reading having been received in evidence without objection despite *918 the lack of such proof. Nor has there been any scientific testimony as to the reliability or fallibility of the internal calibration device.” The court in Perlman (supra, p 973) continued: "In essence, the People seek to have this court take judicial notice of the general reliability of radar as a speed detection device, where properly tested, and as to the general reliability of the internal calibration device, as a means for testing the accuracy of radar. This court has no difficulty with the former, but as to the latter, without expert testimony or a known history of general reliability developed through court usage and acceptance, this court cannot do so.”
This court is perplexed by the questions raised by Perlman. Clearly, both in Perlman and here more than internal calibration tests have been made, the tuning fork tests are distinguished from internal calibration tests even by the Judge in Perlman. Furthermore, this court, perhaps unlike the court in Perlman, has had indications of "general reliability” of the tests for checking the accuracy of the radar "developed through court usage and acceptance.” As a result of the Federal funding of a program to control speed on Interstate 684, numerous tickets for speeding (more than 1,900) were issued by the State Police during nine months of 1976. Many persons pleaded not guilty and trials were held. Troopers often testified that they tested the radar using the same methods as this trooper did, and then observed a vehicle whose speed they estimated and clocked on radar. Their testimony invariably has indicated that their estimate is based on extensive experience and is within one, two or occasionally, but rarely, five miles of that shown on the radar screen. That history is pertinent and, unlike the court in People v Perlman (89 Misc 2d 973, supra), this court believes there is a "history of general reliability of this radar” and the tests used to check it "developed through Court usage and acceptance.” For the foregoing reasons, this court rejects the reasoning of Perlman and denies the motion to dismiss.
The court wishes to note one other point. Defendant raises a question of the reliability of the tuning forks, in that they, according to him, may have been dropped. Nothing in the record remotely suggests that they were dropped or inaccurate in any way and this suggestion is rejected.
The fine shall be $40, payable within two weeks.