COMMONWEALTH vs. KATHLEEN WHYNAUGHT.

Middlesex. October 2, 1978. — January 3, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Evidence*, Speed, Radar speed measuring device, Competency, Judicial discretion. *Motor Vehicle*, Operation.

Although evidence of the accuracy of a radar speed measuring device was insufficient, this court affirmed the conviction of a defendant charged with speeding where the issue of the proper testing of such devices had not previously been raised in this Commonwealth, where the police followed testing habits which had been consistently acceptable and unchallenged in the trial courts, where the radar reading showed evidence of a speed greatly in excess of the legal limit, and where the observations of a police officer were corroborative of the reading on the radar unit. [20-21]

This court declared its intention to reverse any conviction and order that a judgment for the defendant be entered in any speeding case tried after the date of this opinion, where radar readings from untested equipment are admitted over objection and without independent corroborative evidence. [21]

The provisions of G. L. c. 90, § 17, did not require that at the trial of a defendant charged with speeding the Commonwealth prove that the defendant exceeded the speed limit for a distance of at least one quarter of a mile. [21-22]

COMPLAINT received and sworn to in the First District Court of Southern Middlesex on October 19, 1976.

The case was heard by *Chernoff*, J.

*Michael J. McHugh*, Legal Assistant to the District Attorney, for the Commonwealth.

*Aram K. Berberian*, of Rhode Island, for the defendant.

HENNESSEY, C.J. The defendant, Kathleen Whynaught, was convicted of speeding pursuant to G. L. c. 90, § 17, after a jury waived trial in the First District Court of Southern Middlesex. Appealing her conviction, she

argues that the trial judge erroneously admitted readings taken from an untested radar speed measuring device and that the prosecution had a statutory burden, which it failed to meet, to prove excessive operation over a one-quarter mile course. We overrule the defendant's exceptions.

The facts are not in dispute. On August 19, 1976, State Trooper Michael Salzman, the detection half of a two-person traffic control unit, was operating a radar device on Route 495 near Hopkinton. Observing readings from the radar unit, Trooper Salzman determined that an automobile was travelling seventy-five miles an hour on a highway posted for fifty-five. He so notified State Trooper John Brunnetta, the apprehending half of the unit, who stopped the defendant's vehicle and issued a citation.

At trial, Trooper Salzman testified that the radar unit he employed was made by the Dacatur Company and was tested for accuracy by means of an internal calibration mechanism. The testing procedure, he explained, involved the selection of two specific settings, one at thirty miles an hour and another at sixty miles an hour; if the unit when turned to those settings read out the correct number on a screen, it was accepted to be accurate. This procedure, he said, was followed approximately every hour on the date of the offense, including once forty-five minutes prior to his clocking the defendant. In addition to his own testing, Trooper Salzman stated that the instrument had been calibrated on different occasions by a radio engineer, although no specific dates were indicated.

The prosecution also offered the testimony of Trooper Brunnetta, who estimated that, on the basis of his independent observation of the defendant's vehicle, its speed was approximately seventy-five miles an hour. The officer testified that there was a clear area for visual observation, explaining "you could see the cars back easy."

1. *Admissibility of Radar Evidence.*

Ever since the appearance of the automobile impelled lawmakers to enact laws to restrict its speed, law enforce-

ment officers have experimented with various types of speed detection devices, seeking reliable methods by which to measure vehicular velocity. From the beginning, objective means of speed determination have been thought desirable, because opinion evidence, while admissible, may tend to leave doubts in the minds of judges and jurors. E. C. Fisher & R. H. Reeder, Vehicle Traffic Law 143-144 (1974). Indeed, commencing with the acceptance of stopwatch evidence in Great Britain, see *Gorham* v. *Brice*, 18 T.L.R. 424 (K.B. Div. 1902), law enforcement officials and courts have increasingly depended on scientific devices as a means of enforcing speeding laws, and, in turn, preventing traffic accidents. See McCormick, Evidence § 210 (2d ed. 1972).

In 1910 this court had occasion to consider the admissibility in a speeding case of evidence derived from a "Photo-Speed-Recorder." *Commonwealth* v. *Buxton*, 205 Mass. 49 (1910). The instrument challenged in that case determined an automobile's rate of speed through the use of a series of rapid sequence pictures and a chronometer; by comparing the photographs to measure the distance travelled, and then dividing by time, a motor vehicle's velocity could be easily calculated. In the belief that it would be beneficial to have objective proof from a "machine whose action [was] dependent upon the uniform working of the laws of nature," we held "Photo-Speed-Recorder" evidence admissible in speeding prosecutions. *Id.* at 53.

Since our decision in *Buxton*, we have not been called on to decide the admissibility of evidence derived from more sophisticated speed detection devices. Other jurisdictions, however, have considered such questions and have had no difficulty in sanctioning, for evidence purposes, the use of the speedometer, *Spokane* v. *Knight*, 96 Wash. 403 (1917), *State* v. *Tarquinio*, 3 Conn. Cir. Ct. 566 (1966), or other electrical or mechanical recording instruments, see *Webster Groves* v. *Quick*, 323 S.W.2d 386 (Mo. App. 1959); *People* v. *Pett*, 13 Misc. 2d 975 (N.Y. Police J.

Ct. 1958). The speed detection instrument most heavily relied on, and the one in most common use, is the radar speedmeter.[1] The application of radar to traffic control has been encouraged by the fact that those courts which have considered the issue have almost uniformly taken judicial notice of radar's underlying scientific principles and of the general capability of the speedmeter to measure speed accurately. See, e.g., *State* v. *Dantonio*, 18 N.J. 570 (1955); *People* v. *Magri*, 3 N.Y.2d 562 (1958); *Evernight* v. *Little Rock*, 230 Ark. 695 (1959); *State* v. *Tomanelli*, 153 Conn. 365 (1966); *East Cleveland* v. *Ferell*, 168 Ohio St. 298 (1958); *United States* v. *Dreos*, 156 F. Supp. 200 (D. Md. 1957) (applying Maryland law).

Although the defendant does not challenge the validity of radar principles or their application to determining speed, we think it appropriate to state here our judicial notice of the radar speedmeter as an accurate and reliable means of measuring velocity. As we said in *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963), and have repeated more recently in *Commonwealth* v. *Lykus*, 367 Mass. 191, 196 (1975): "Judicial acceptance of a scientific theory or instrument can occur only when it follows a general acceptance by the community of scientists involved. When supported by substantial authority establishing scientific reliability, this court has not hesitated to accept the benefits of science." See also *Commonwealth* v. *Vitello*, 376 Mass. 426, 430-431 (1978). In light of soci-

---

[1] The radar speedmeter is an application of the physical principle known as the "Doppler effect." The instrument emits a continuous beam of microwaves of known frequency down a highway. An oncoming or receding vehicle reflects these waves, which are then received by the radar unit. The difference in frequency between the transmitted and received signals is measured, and in application of the "Doppler shift" principle, vehicles' speeds will be found proportional to the difference in frequencies. See McCormick, Evidence § 210 (2d ed. 1972); M. Skolnick, Introduction to Radar Systems 1-19 (1962); Kopper, The Scientific Reliability of Radar Speedmeters, 33 N.C.L. Rev. 343 (1955); McCarter, Legal Aspects of Police Radar, 16 Clev.-Mar. L. Rev. 455 (1967).

ety's widespread use of radar devices, in forms ranging from air-traffic control monitors to homing radars on guided missiles, see M. Skolnick, Introduction to Radar Systems 14-18 (1962), and considering other courts' acceptance of radar, we view the scientific basis of radar as indisputable.[2]

The more substantial question in cases where radar results are offered regards the accuracy of the particular speedmeter at the time the speed measurement was made. While there has been some suggestion to the contrary,[3] most courts have agreed that the admission of radar evidence is conditioned on a demonstration to the court of the accuracy of the radar apparatus. See, e.g., *State* v. *Gerdes*, 291 Minn. 353 (1971); *State* v. *Finkle*, 128 N.J. Super. 199, 207, aff'd 66 N.J. 139 (1974), cert. denied, 423 U.S. 836 (1975); *People* v. *Perlman*, 89 Misc. 2d 973 (N.Y. Dist. Ct. 1977); *Royals* v. *Commonwealth*, 198 Va. 876 (1957). See also Latin, Tannehill & White, Remote Sensing Evidence and Environmental Law, 64 Calif. L. Rev. 1300, 1413-1414 (1976). There has been a divergence in views, however, on the issue as to what tests are sufficient to prove accuracy. In this respect, some courts have found adequate foundations in various combinations of the following three means of testing radar speedmeters: (1) a "run through," in which another police car closes on the site, holding a given speedometer reading; (2) use of calibrated tuning forks, intended to produce frequencies which will cause the machine, if accurate, to read particular speeds; and (3) use of a signal generator within the machine for the same purpose. See McCormick, *supra*.[4]

---

[2] See authorities cited at note 1, *supra*.

[3] See *People* v. *Barbic*, 105 Ill. App. 2d 360 (1969); *People* v. *Abdallah*, 82 Ill. App. 2d 312 (1967); *People* v. *Dusing*, 5 N.Y.2d 126, 128 (1959).

[4] Among the tests for radar speedmeter devices found sufficient to demonstrate accuracy are the use of two tuning forks calibrated at different frequencies, *State* v. *Carta*, 2 Conn. Cir. Ct. 68 (1963); the use of a single tuning fork, *People* v. *Abdallah, supra*; the use of an internal checking mechanism combined with two tuning fork tests, *People*

It is our opinion that some foundation requirement pertaining to the accuracy of the particular radar instrument is appropriate in order to ensure that the persuasive force of scientific results is not improperly triggered. At present, however, we do not insist that this foundation be based exclusively on any one or two of the three principal tests or that testing occur with any given frequency. Instead, in any case where the issue is raised by the defendant, we leave it to the discretion of the trial judge to determine when a sufficient showing of the particular radar instrument's accuracy has been made. See *Commonwealth* v. *Buxton,* 205 Mass. 49, 52 (1910); *Guinan* v. *Famous Players-Lasky Corp.,* 267 Mass. 501, 521-522 (1929). We assume that judges will closely examine the nature of all testing procedures and that they will be guided in their admission decisions by the quality of the tests performed, rather than by their quantity. See *People* v. *Perlman, supra* at 978. At the same time, we expect that the testing requirements judges impose will not be so onerous as to make use of radar devices a practical impossibility.[5] For example, the "run through" test referred to, *supra,* is a simple procedure in which the test automobile's speedometer and the radar unit are mutually corroborative, although neither device may have been tested by more sophisticated methods.

v. *Lynch,* 61 Misc. 2d 117 (N.Y. County Ct. 1969); and a single tuning fork test coupled with comparison to a speedometer, *State* v. *Shimon,* 243 N.W.2d 571 (Iowa 1976). See also Annot., 47 A.L.R.3d 822 (1973). At least one court has found a single tuning fork test insufficient to show accuracy, see *State* v. *Gerdes,* 291 Minn. 353 (1971).

[5] Standards for testing radar speedmeter equipment might well be a subject for legislative consideration. In at least two jurisdictions, admission of radar evidence in speeding prosecutions is facilitated by a certification procedure for radar equipment. Under these statutes a certificate from a testing station indicating that the device was tested for accuracy within a specified period serves as competent and prima facie evidence of an instrument's reliability. See Pa. Stat. Ann. tit. 75, § 3368(d) (Purdon 1977); Va. Code § 46.1-198 (1974). See also G. L. c. 233, § 79, which outlines a certification procedure to establish truth and completeness of hospital records.

In the instant case, the record indicates that the judge,
over the defendant's objection, required no foundation
whatsoever regarding the radar unit's accuracy. In direct
examination, however, Trooper Salzman testified that
the radar unit in question had been the subject of repeat-
ed testing by means of its internal calibration mech-
anism. Yet, the testimony of Trooper Salzman fails to
provide any basis for evaluating the reliability of this
calibration procedure. In addition, the record contains no
expert testimony or other evidence from which the foun-
dational sufficiency of the exclusive utilization of this
testing mechanism might be found.[6]

Despite our unwillingness on this limited record to
sanction this type of radar testing, we affirm the convic-
tion here for several reasons. First, the issue has not
previously been raised in this Commonwealth, and there
is every indication that the police followed testing habits
that have been consistently acceptable and apparently
unchallenged in the trial courts. More important, the
radar reading, as well as the testimony of the police offi-
cer who testified from his observation of the moving vehi-
cle, showed evidence of a speed greatly in excess of the
legal limit ("seventy-six," and "approximately seventy-
five" miles an hour, on a highway posted for fifty-five).
Further, the observations of the officer were corrobora-
tive of the reading on the radar unit. Thus, affirming the
conviction here is consistent with fairness and justice.
*People* v. *Magri*, 3 N.Y.2d 562, 566-567 (1958). Cf. *State* v.
*Bonar*, 40 Ohio App. 2d 360 (1973). We add that, in any
speeding case tried after the date of this opinion, where
radar readings from untested equipment are admitted

_____

[6] There is disagreement as to the validity of using an internal test-
ing mechanism to determine the accuracy of a radar unit. Compare
*People* v. *Perlman*, 89 Misc. 2d 973 (N.Y. Dist. Ct. 1977) (internal
testing insufficient), with *State* v. *Harper*, 382 A.2d 263 (Del. Super. Ct.
1978) (internal testing sufficient). Since we do not decide the adequacy
of internal testing here, the question remains one for trial judges to
consider, on appropriate evidence.

over objection and without independent corroborative evidence, we shall undoubtedly reverse any judgment of guilt and order that a judgment of not guilty be entered. The issue as to what constitutes adequate testing we leave to a consideration of specific future cases as appraised in light of the general principles included in this opinion.

2. *Statutory Elements of G. L. c. 90, § 17.*

The second issue raised by the defendant questions whether a motorist may be adjudged guilty of operating a vehicle at an unreasonable speed absent any proof of the distance of such operation. More specifically, it is the defendant's contention that the prosecution failed to present evidence establishing, as provided in G. L. c. 90, § 17,[7] that the defendant drove her car for a distance of one-quarter of a mile at a rate exceeding fifty-five miles an hour. Urging that this was a crucial element of the crime charged, the defendant argues that her conviction was violative of the due process clause of the Fourteenth Amendment to the United States Constitution. *Vachon* v. *New Hampshire*, 414 U.S. 478 (1974).

We believe that the defendant has misconstrued the statute. The elements which the Commonwealth must prove to sustain a conviction are contained in the first sentence of the section. There it states that "[n]o person ... shall run [a motor vehicle] at a rate of speed greater than is reasonable and proper, having regard to traffic and the use of the way and safety of the public." Thus, the Commonwealth's only burden is to present such evidence

---

[7] General Laws c. 90, § 17, as amended through St. 1975, c. 494, § 7, reads in part as follows: "No person operating a motor vehicle on any way shall run it at a rate of speed greater than is reasonable and proper, having regard to traffic and the use of the way and the safety of the public. Unless a way is otherwise posted in accordance with the provisions of section eighteen, it shall be prima facie evidence of a rate of speed greater than is reasonable and proper as aforesaid (1) if a motor vehicle is operated on a divided highway outside a thickly settled or business district at a rate of speed exceeding fifty miles per hour for a distance of a quarter of a mile ...."

as to permit the trier of fact to find beyond a reasonable doubt that the defendant has failed so to operate his motor vehicle. *Commonwealth* v. *Bosworth*, 257 Mass. 212, 217 (1926). *Commonwealth* v. *Cassidy*, 209 Mass. 24, 28 (1911). Distance travelled may be relevant, but it certainly is not a required element of proof.

The language of the section that the defendant relies on does not create a statutory element of the offense. It merely sets forth prima facie evidence of a statutory violation. The purpose of such a rule is to assist the Commonwealth in carrying its burden of persuasion on the issue of reasonable and proper speed. *Commonwealth* v. *Cassidy, supra.* See generally W. B. Leach & P. J. Liacos, Massachusetts Evidence 53-60 (4th ed. 1967).

*Exceptions overruled.*